THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN VANGUARD CORPORATION, 4695 MacArthur Court, Suite 1250 Newport Beach, CA 92660,<br><br>Plaintiff,<br><br>v.<br><br>LISA P. JACKSON, Administrator of United States Environmental Protection Agency,<br><br>and<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Ariel Rios Building 1200 Pennsylvania Avenue, N.W. Washington, D.C. 20460,<br><br>Defendants. | Case No. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

American Vanguard Corporation ("AMVAC"), for its complaint, states:

### INTRODUCTORY STATEMENT OF THE CASE

AMVAC challenges, and seeks to enjoin Defendants (collectively, "EPA") from enforcing, an August 12, 2010 Stop Sale, Use, or Removal Order ("SSURO")[1] purportedly issued under the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §§ 136-136y. The SSURO requires the immediate cessation of all sales and destruction of AMVAC's products containing Technical Grade pentachloronitrobenzene ("PCNB"). This product is and has been a

---

[1]     A copy of the SSURO is attached hereto as Exhibit 1.

registered pesticide under FIFRA for almost thirty years.  The SSURO will cause millions of dollars in damages to AMVAC in the next three months alone.  The damage is already occurring because the product is principally purchased and shipped only in August and September because it is only effective if applied in the Fall.

EPA provided no notice or opportunity for a hearing prior to issuing the SSURO, nor did it make a prior finding that AMVAC violated FIFRA, a condition precedent to issuance of the SSURO.  It did not even warn AMVAC that it was planning to issue such an order.  EPA has not alleged, nor can it, that the Technical Grade PCNB creates a threat to human health or the environment.  EPA waited until the eve of AMVAC's brief selling season to issue the SSURO.  AMVAC can only assume that the timing and nature of this unusual and indefensible order arose from the agency's intention either to destroy AMVAC's business before review of its illegal actions could be obtained, or to pressure AMVAC to meet demands that are unsupported by law.  What is even more unsettling is the fact that the issuance of the SSURO has nothing to do with whether the product is "safe" - it has been approved repeatedly by the agency.  Rather, this appears to be an administrative paperwork issue - whether a Confidential Statement of Formula ("CSF") that EPA approved three times, should now be changed to reference the presence of trace amounts of an impurity about which EPA:  (i) has known for almost twenty years (thanks to AMVAC having reported it); (ii) was aware when it issued prior approvals; and (iii) has never determined was required to be included on the CSF before ordering destruction of the product.  As set forth below, the SSURO is invalid because it was issued without prior notice or opportunity for a predeprivation hearing in violation of the Administrative Procedures Act ("APA") and the U.S. Constitution, was not preceded by a determination that any violation of

FIFRA occurred, and is wholly unsupported by any facts or reasoned basis in violation of the APA.

## JURISDICTION AND VENUE

1.      AMVAC seeks judicial review of agency action pursuant to 5 U.S.C. §§ 558, 702-706, a declaratory judgment pursuant to 28 U.S.C. § 2201 and injunctive relief pursuant to 5 U.S.C. § 705.

2.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 7 U.S.C. § 136n.

3.      Venue is appropriate in this district under 28 U.S.C. § 1391(e)(2).

## PARTIES

4.      AMVAC is a Delaware corporation with its principal place of business in California.  It is the parent company of AMVAC Chemical Company, a California corporation in the business of manufacturing and selling specialty chemicals in the agricultural, residential, animal health, and turf and ornamental markets, including but not limited to insecticides, pesticides, herbicides, fungicides, and plant growth regulators.

5.      Defendant Lisa Perez Jackson is the Administrator of the United States Environmental Protection Agency.

6.      Defendant United States Environmental Protection Agency is the federal government agency responsible for implementing and enforcing a variety of federal environmental laws, including, *inter alia*, the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or the "Act"), 7 U.S.C. § 136 *et seq.*

## FACTUAL BACKGROUND

*FIFRA Licenses for Registered Pesticides*

7.      Under FIFRA, 7 U.S.C. § 136a, a person may sell a pesticide only if that pesticide has been registered by EPA.  Registration under FIFRA requires the applicant to submit a variety of complex and detailed information and data about the particular pesticide that is the subject of the application, including, *inter alia*, a complete formula for the pesticide.  7 U.S.C. § 136a (c)(1)(D).  The EPA has authority to review that information to ensure that the pesticide meets the safety requirements set forth in the law.

8.      Among other things, approval of a pesticide requires submission of the formula/product composition of a pesticide.  The product chemistry data required to support this determination is set forth at 40 C.F.R. § 158.320.

9.      The complete formula/product composition of a pesticide registration may also require the identification of impurities.  For purposes of this case, the following impurities must be identified:  (i) impurities associated with the active ingredient that EPA specifically determines are "toxicological significance," 40 C.F.R. § 158.320(c); and/or (ii) other impurities associated with the active ingredient that are found to be present in any sample at a level equal or greater than 0.1 percent by weight of the technical active ingredient.  40 C.F.R. § 158.320(d).  Only the first of these conditions is at issue in this case.

10.     For purposes of this case, the term "impurity associated with an active ingredient" means any impurity which forms in the pesticide product through reactions between the active ingredient and any other component of the product or packaging of the product.  40 C.F.R. § 158.300.

11.     When preparing a FIFRA pesticide registration, the complete formula and product composition are included in a CSF.  The CSF allows the EPA to review the complete formula

and product composition, while maintaining this information as confidential business information. 40 C.F.R. § 158.33.

12.     EPA must approve a FIFRA pesticide registration if: (i) its composition is such as to warrant the proposed pesticidal claims of the product; (ii) its labeling and other material required to be submitted comply with FIFRA requirements; (iii) the product will perform its intended function without unreasonable adverse effects to the environment; and (iv) when used in accordance with widespread and commonly recognized practices it will not generally cause unreasonably adverse effects on the environment. 7 U.S.C. § 136a(c)(5).

13.     Once a product is registered with EPA, the product may be manufactured and distributed in commerce, so long as the percentages of active and inert materials are as provided for in the approved product label, and the product is sold under the approved label. In other words, the registration acts as a license to market and sell the product subject to certain restrictions.

14.     Under Section 3(f)(2) of FIFRA, "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be *prima facie* evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]". 7 U.S.C. § 136a(f)(2).

15.     If after approval, a pesticide registrant obtains additional factual information regarding unreasonable adverse effects on the environment, the registrant must submit such information to EPA. 7 U.S.C. § 136(a)(2). This is called a FIFRA "6(a)(2)" submission.

16.     With respect to impurities associated with any given pesticide product registration, if the impurity is discovered after the initial registration under current regulations, it must be reported to EPA in a FIFRA Section 6(a)(2) notice pursuant to 40 C.F.R. § 159.179(b). AMVAC has complied with this regulation in all respects. AMVAC, moreover, made a precautionary submission under FIFRA Section 6(a)(2) in 1993 that included information containing Impurity

X.  That precautionary submission was made pursuant to a 1985 interpretive rule (See 57 Fed. Reg. 44290, Sept. 20, 1985) that was more ambiguous than the current rule regarding the circumstances in which impurity information must be submitted.

17.     Upon information and belief, there is no definition of the term "toxicological significance," nor is there a list that tells a registrant what substances, if any, must be reported even where they are present as impurities at levels below 0.1% because they are of "toxicological significance."

18.     If EPA determines - from the 6(a)(2) submission or from other independently developed information - that a registered pesticide or its labeling or other material required to be submitted as part of its pesticide registration does not comply with FIFRA, or when used in accordance with wide-spread practice, the pesticide generally causes unreasonable adverse effects on the environment, EPA may do one of two things.  First, it may issue a notice of cancellation of the registration, in which case the registrant can request a hearing to contest the cancellation.  In this case cancellation is not effective and final until after the hearing is conducted.  Second, if EPA believes that the pesticide poses an imminent hazard, then the registration may be suspended during the time period the pesticide cancellation proceedings are conducted.  7 U.S.C. § 136d.  In either case, the pesticide registrant is entitled to a hearing before the notice of cancellation is finalized or effective, to challenge the determination.  *Id.*  Moreover, a registrant is entitled to an indemnity payment from EPA where it suffers a loss as a result of the suspension or cancellation. 7 U.S.C. § 136m(a)(1).

19.     Section 12(a)(1)(C) of FIFRA, 7 U.S.C. § 136j(a)(1)(C), states that it shall be unlawful for any person to distribute or sell any registered pesticide the composition of which differs at the time of its distribution or sale from its composition described in the CSF.  In, this regard, EPA

has a range of enforcement options, including: (i) Notices of Warning under sections FIFRA Sections 9(c)(3), 14(a)(2), and 14(a)(4); (ii) Notices of Detention under FIFRA Section 17(c); (iii) Stop Sale, Use, or Removal Orders under FIFRA Section 13(a); (iv) Seizures under FIFRA Section 13(b); (v) Injunctions under FIFRA Section 16(c); (vi) Civil administrative penalty assessments under FIFRA Section 14(a); and (vii) Referrals for criminal proceedings under FIFRA Section 14(b).

20.      Section 13(a) of FIFRA, 7 U.S.C. § 136k(a), authorizes the Administrator of EPA to issue an order prohibiting the sale, use or removal of any pesticide by any person whenever there is reason to believe the pesticide is in violation of any provision of FIFRA or has been or is intended to be distributed or sold in violation of any provision of FIFRA. These Stop Sale, Use, and Removal Orders ("SSUROs") prohibit any person from selling, using, or removing the targeted pesticide after receipt of the SSURO, except where the terms of the SSURO allow. *Id.* Thus, where an affected product has an EPA registration, a SSURO can effectively revoke the license granted to the registered pesticide.

21.      According to EPA, SSUROs "are generally reserved for situations involving a potential hazard to health or the environment," and that prior to issuing the SSURO, EPA must "[i]dentify the violation *and develop evidence to support the existence of a violation*." *See* EPA Fifra Inspection Manual at 10-2, available at http://www.epa.gov/compliance/resources/publications/ monitoring/fifra/manuals/fifra/fiframanch_10.pdf (emphasis added). EPA has acknowledged that it must make findings with respect to the toxicological significance of impurities in order to put the regulated community on notice of what is required, and to "[s]et a clear standard that can be readily applied by EPA/states and the regulated industry alike." *See* Pesticide Regulation (PR) Notice 96-8 at 2, available at http://www.epa.gov/PR-Notices/.

*AMVAC's PCNB*

22.     AMVAC distributes and sells a product called "Technical Grade PCNB." Technical

Grade PCNB is a registered pesticide product (EPA Registration No. 5481-197) under FIFRA.

The active Ingredient in Technical Grade PCNB is pentachloronitrobenzene or "PCNB." PCNB

is a pesticide active ingredient used, in part, to prevent fungus growth called "snow mold" on

turf, in particular golf course fairways and greens. It is applied at the end of the golf season (in

the fall) because snow mold is a fungus that develops in the winter and manifests itself in Spring

after snow and cold weather have subsided. If used correctly this product prevents destruction

and harm which in turn would otherwise require replanting and restoration, requiring the use of

more and different pesticides, herbicides and other products.

23.     Technical Grade PCNB, was first registered as a pesticide on October 10, 1985, under the

name "Technical Grade PCNB 95%." Its FIFRA registrations were amended and approved on

September 9, 1992, and March 27, 1999.

24.     In early 1999, the Active Ingredient ("AI") concentration for Technical Grade PCNB was

changed by AMVAC to 96.2%. A CSF was prepared and submitted to EPA for review and

approval to support this change. EPA approved of the revised label in writing in December of

1999.

25.     PCNB has been sold by AMVAC since 1985, after it was first registered as a pesticide.

There have been no reported incidents of impacts to health or to the environment from the proper

application of PCNB.

26.     PCNB is applied in a very specific way and time, and in combination with a number of

other products. It can only be properly applied in late October and November. Consequently,

those seeking to use it only purchase it in August and September.

27.    At some point prior to July 2, 1993, AMVAC detected, in the course of its manufacturing of Technical Grade PCNB products, small quantities of an impurity ("Impurity X")[2] in the products.

28.    As a result of this discovery, on July 2, 1993, AMVAC notified EPA of the existence of Impurity X in Technical Grade PCNB products ("6(a)(2) Notice").  This was done before the current FIFRA Section 6(a)(2) implementing regulations at 40 C.F.R. § 159 *et seq.*, were first promulgated in 1997, and as a precautionary measure, as it was not clear that the notification was even required under then-existing law.  The precautionary notification was not based on any belief or assertion that Impurity X as present in Technical Grade PCNB products was of "toxicological significance."

29.    At the time of the July 2, 1993 6(a)(2) Notice, and at all times prior to August 12, 2010, neither AMVAC nor EPA had ever determined that Impurity X in Technical Grade PCNB products is or was an impurity of toxicological significance.

30.    On at least two occasions subsequent to the July 2, 1993 6(a)(2) Notice, in accordance with requested amendments to its FIFRA registrations, AMVAC submitted, and EPA accepted, Confidential Statements of Formula for Technical Grade PCNB products that did not include Impurity X as an impurity of toxicological significance.

31.    In 2003, AMVAC sought to revise the Technical Grade PCNB label.  Following discussions, EPA approved the revised label on February 2, 2004.  The EPA, though aware of the presence of Impurity X, did not require that the revised CSF mention Impurity X.

---

[2]    The identity of Impurity X is protected from disclosure as Confidential Business Information under EPA regulations.  AMVAC does not believe it is necessary to identify Impurity X for purposes of this complaint at this time.  Should that change, it will do so under seal, if the Court so approves.

32.    On January 10, 2005, AMVAC prepared a second CSF to submit to EPA. This second CSF was amended again. The amendment did not change any of the listed chemicals or percent weights of individual ingredients. This second CSF was approved by EPA by letter dated April 21, 2005. EPA, though aware of the presence of Impurity X, did not require that the revised CSF mention Impurity X.

33.    In December of 2009, AMVAC contacted EPA to discuss the Impurity X issue. AMVAC told EPA that it had initiated an Impurity X data collection and manufacturing process review for Technical Grade PCNB. Samples of Technical Grade PCNB were sent to an outside laboratory for Impurity X analysis in January of 2010, and the results were sent to EPA in March of 2010.

34.    An initial teleconference between AMVAC and EPA officials was scheduled in April 2010. During that teleconference, AMVAC reminded EPA of the FIFRA Section 6(a)(2) Notice sent from AMVAC to EPA by letter dated July 2, 1993. Jill Bloom, EPA Review Manager, Office of Pesticide Programs, confirmed that EPA was aware of this notification. Because Impurity X was created unintentionally in the manufacturing process, AMVAC answered EPA questions regarding that process, such as process temperatures and production stages, and where in the process the Impurity X may have been generated. At no time during this call did EPA allege that the manufacturing process had changed in any material respect from that which was reflected in the prior approved CSFs.

35.    At no time during this teleconference did EPA inform AMVAC that it had found that Impurity X as present in Technical Grade PCNB, was of toxicological significance as provided for in the regulations, nor that the levels of Impurity X as detected in the March 2010 Technical Grade PCNB, posed a toxicological risk - significant or otherwise. EPA did not indicate during

this teleconference that the CSF supporting the Technical Grade PCNB pesticide registration needed to be amended, that any violation of FIFRA existed, or that the agency was considering issuing a SSURO for this product.

36.     The teleconference ended with AMVAC stating that it would be investigating its Technical Grade PCNB manufacturing process to determine how the low level Impurity X was being generated (as they are not found in the raw materials used to manufacture Technical Grade PCNB) and to investigate solutions to this situation.  The EPA officials appeared to be satisfied with this action plan.

37.     At AMVAC's request, after it had conducted expensive and time-consuming sampling and testing of samples for the presence of Impurity X, a follow-up meeting to further discuss Impurity X was scheduled for and conducted on June 3, 2010.  The meeting was convened at AMVAC's request and was held at EPA's offices.  AMVAC informed EPA that based on additional testing, only very, very small quantities of Impurity X impurities are formed in the manufacture of the crude PCNB and that changes to the current PCNB manufacturing process were being considered.  EPA was also informed that:  (i) AMVAC was the only registered PCNB manufacturer in North America; (ii) the Technical Grade PCNB manufacturing process is extremely complex and would require months of downtime if operations were shut down temporarily; (iii) Technical Grade PCNB inventories had to be kept built up to adequately serve customers (about 3 million pounds); (iv) the current Technical Grade PCNB inventory was being sampled for Impurity X on a Lot basis; and (v) the formulation/technical relationship between PCNB manufacture and Impurity X formation was actively being investigated.  Again, EPA appeared satisfied with the steps that AMVAC was taking to address Impurity X.

38.     At the June 3, 2010 meeting, EPA did not discuss any acceptable or unacceptable levels for Impurity X applicable to technical grade PCNB.   EPA never stated that it thought that AMVAC was violating FIFRA because it did not include Impurity X in its CSF, that it wanted an amendment to Technical Grade PCNB's CSF, or that it was considering issuing an SSURO for AMVAC's PCNB product line.   EPA also never indicated that Impurity X, as applicable to Technical Grade PCNB, was toxicologically significant.

39.     At no time prior to August 12, 2010 did EPA allege that AMVAC's CSF was in violation of FIFRA.

40.     On August 12, 2010, with no prior notice, EPA issued an SSURO ordering AMVAC to immediately cease all sales and distribution of Technical Grade PCNB products.

41.     The SSURO claims, for the first time, that Impurity X generally is a "substance or class of substances known to be of toxicological significance" under 40 C.F.R. § § 158.320(c).

42.     The SSURO does not allege that Impurity X, as present in Technical Grade PCBN, is a "substance or class of substances known to be of toxicological significance" under 40 C.F.R. § 158.320(c).

43.     The SSURO alleges that the formula used for Technical Grade PCNB products sold by AMVAC differed from the formula submitted to EPA in CSFs as a part of the registration process and consequently alleged that sales of PCNB products violated Section 12(a)(1)(C) of FIFRA.

44.     The SSURO required AMVAC to submit within ten days a proposal for proper disposal of PCNB products.

45.     In addition to issuing the SSURO, EPA has advised states of the SSURO, and at least one state regulatory agency has, based solely on this SSURO, cancelled its state registration for PCNB products.

46.     EPA has also posted a website to tell the world about this SSURO.

47.     Prior to issuing the SSURO, EPA had not provided AMVAC with any notice that it determined that Impurity X was an impurity of "toxicological significance" within the meaning of 40 C.F.R. §§ 158.320, 159.179.

48.     Prior to issuing the SSURO, EPA had not provided AMVAC with any notice that the presence of Impurity X required an amended CSF for Technical Grade PCNB products.

49.     Prior to issuing the SSURO, EPA never alleged to AMVAC, nor did AMVAC suggest to EPA, that the formula used for Technical Grade PCNB products sold by AMVAC differed from the formula submitted to EPA in CSF's as a part of the registration process.

50.     Since the issuance of the SSURO, AMVAC has contacted EPA and the EPA has not provided AMVAC with evidence that would support a determination that Impurity X in AMVAC's Technical Grade PCNB products is of "toxicological significance" within the meaning of applicable law or regulation.

51.     EPA has known since 1993 that AMVAC's Technical Grade PCNB products contained Impurity X and that AMVAC has not changed its manufacturing process in any respect that would in any way impact the accuracy of the CSF's submitted by AMVAC and approved by EPA.

52.     EPA was reminded about the presence of Impurity X in January, April and June of this year.

53.     EPA was specifically aware that AMVAC manufactures PCNB products so that is inventory is at optimum levels in August for its short sales window in September and October.

54.     EPA knows that by issuing an SSURO just weeks before the principal time of the year that the product in question is sold, it will effectively cause the greatest possible damage to AMVAC's market regardless of the validity of the SSURO. At least one of AMVAC's major customers has apparently become aware of the SSURO and, as a result, has cancelled an order for Technical Grade PCNB products.

55.     Prior to issuing the SSURO that is destroying AMVAC's PCNB business, EPA has never provided AMVAC with a meaningful and legally sufficient opportunity to be heard with respect to its allegations that sales of PCNB products violate FIFRA Section 12(a)(1)(C).

### COUNT I
### (Violation Of Section 558 Of The Administrative Procedures Act)

56.     Paragraphs 1 through 55 are incorporated by reference as if fully set forth herein.

57.     EPA Registration No. 5481-197 is a license under 5 U.S.C. § 558, permitting AMVAC to sell Technical Grade PCNB products for certain pesticidal applications within the United States.

58.     The August 12, 2010 SSURO revoked that license, by preventing AMVAC from selling Technical Grade PCNB products.

59.     EPA's revocation of AMVAC's license is inconsistent with law as it did not afford AMVAC with notice or an opportunity to be heard.

60.     EPA's revocation of AMVAC's license is arbitrary and capricious as it lacks substantial evidence or a reasoned basis for its decision.

### COUNT II
### (Violation of Section 706 of the Administrative Procedures Act)

61.     Paragraphs 1 through 60 are incorporated by reference as if fully set forth herein.

62.     The August 12, 2010 SSURO is final agency action under 5 U.S.C. § 706.

63.     Section 13(a) of FIFRA, 7 U.S.C. § 136k(a), permits the issuance of an SSURO only where there is reason to believe the pesticide is in violation of any provision of FIFRA.

64.     At the time of the August 12, 2010 SSURO, AMVAC's PCNB products were not in violation of FIFRA.

65.     At the time of the August 12, 2010 SSURO, EPA neither had nor disclosed evidence to support the allegations of violation made in the SSURO.

66.     Based on the foregoing, the August 12, 2010 SSURO is arbitrary, capricious, and inconsistent with law.

## COUNT III
### (Declaratory Judgment—Violation of FIFRA)

67.     Paragraphs 1 through 66 are incorporated by reference as if fully set forth herein.

68.     This complaint presents an actual controversy regarding the interpretation of FIFRA as it relates to the scope and limit of EPA's authority to determine the toxicological significance of ingredients in pesticidal formulae, and to issue an SSURO on the basis of such a determination.

69.     Pursuant to 28 U.S.C. § 2201(a), to resolve the actual controversies regarding the interpretation and application of FIFRA and the EPA's authority with respect thereto, AMVAC seeks a declaratory judgment, as set forth below, with respect to the duties and obligations of the EPA under FIFRA.

70.     FIFRA does not authorize the issuance of the SSURO without a prior finding of a violation of FIFRA.

71.     EPA never, prior to issuing the SSURO, determined that AMVAC violated FIFRA.

## COUNT IV
### (Declaratory Judgment—Due Process)

72.     Paragraphs 1 through 71 are incorporated by reference as if fully set forth herein.  This count is pled in the alternative to Count III.

73.     This complaint presents an actual controversy regarding the interpretation of the Fifth Amendment to the United States Constitution as it relates to the scope and limit of EPA's authority to issue an SSURO without providing the target of such SSURO with notice and an opportunity to be heard.

74.     Pursuant to 28 U.S.C. § 2201(a), to resolve the actual controversies regarding the interpretation and application of FIFRA and the EPA's authority with respect thereto, AMVAC seeks a declaratory judgment, as set forth below, with respect to the constitutionality of FIFRA as applied by EPA to the facts of this case.

75.     AMVAC's PCNB business is a substantial property within the meaning of the Fifth Amendment to the United States Constitution.

76.     The SSURO deprives AMVAC of its PCNB business.

77.     EPA failed to afford AMVAC predeprivation notice and opportunity to be heard regarding the SSURO.

**COUNT V**
**(Injunctive Relief)**

78.     Paragraphs 1 through 77 are incorporated by reference as if fully set forth herein.

79.     AMVAC lacks an adequate remedy at law with respect to, and will suffer irreparable harm as a result of, EPA's issuance of the SSURO.

80.     AMVAC cannot, in a suit for damages brought in this Court, recover damages as compensation for the costs, expenses, competitive and other injuries they have and will suffer as a direct result of actions of the EPA described herein.

81.     AMVAC asks, therefore, that, as an alternative form of relief, the Court enter an injunction in the form requested below.

WHEREFORE, AMVAC respectfully requests that this Court:

a.      Hold unlawful and set aside the August 12, 2010 SSURO;

b.      Declare that FIFRA does not authorize the use of SSUROs alleging a violation of Section 12(a)(1)(C) where there has not been a determination that an impurity not identified in submitted formulae is of toxicological significance, and where there has not been afforded to the registrant notice and an opportunity to be heard, and accordingly issuance of the August 12, 2010 SSURO was error;

c.      Declare that Section 558 of Administrative Procedures Act requires notice and an opportunity to be heard prior to the deprivation of a registrant's right to sell a registered pesticide;

d.      Declare that the Fifth Amendment to the United States Constitution requires notice and an opportunity to be heard prior to the deprivation of a registrant's right to sell a registered pesticide, and accordingly Section 13(a) of FIFRA, 7 U.S.C. § 136k(a), to the extent it was applied by EPA to so deprive AMVAC of its rights without Due Process, is unconstitutional;

e.      Preliminarily and permanently enjoin enforcement of the August 12, 2010 SSURO;

f.      Issue a Temporary Restraining Order enjoining enforcement of the August 12, 2010 SSURO;

g.      Award attorney's fees and costs; and

h.      Award such other relief as is just.

Respectfully Submitted,

K&L GATES LLP

Barry M. Hartman (D.C. Bar #291617)
Christopher R. Tate (D.C. Bar #989033)
Christopher Nestor*
Thomas R. Carey**

1601 K Street, N.W.
Washington, D.C.  20006-1600
Phone: 202.778.9000

17 North Second Street, 18th Floor*
Harrisburg, PA 17101-1507
Phone: 717.231.4500

70 W. Madison St., 3100**
Chicago, IL 60602
Phone: 312.372.1121

barry.hartman@klgates.com
christopher.tate@klgates.com
christopher.nestor@klgates.com
thomas.carey@klgates.com

# EXHIBIT 1



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

AUG 1 2 2010

OFFICE OF
ENFORCEMENT AND
COMPLIANCE ASSURANCE

## CERTIFIED MAIL RECEIPT RETURN REQUESTED
## ELECTRONIC TRANSMISSION

Mr. Eric Wintemute
President and Chief Executive Officer
American Vanguard Corporation
4695 MacArthur Court, Suite 1250
Newport Beach, CA 92660

> *Re*:   STOP SALE, USE OR REMOVAL ORDER
> AMVAC and AMVAC Chemical Corporation

Dear Mr. Wintemute:

Enclosed is a Stop Sale, Use, or Removal Order (Order) from the United States Environmental Protection Agency (EPA) concerning American Vanguard Corporation's (AMVAC's) registered pesticide products containing pentachloronitrobenzene (PCNB). The Order pertains to, but is not limited to, AMVAC's registered pesticide, Technical Grade PCNB 95% (EPA Registration Number 5481-197).

The Order shall extend to all PCNB-containing pesticide products derived from the technical grade pesticide or from the same source of PCNB active ingredient, directly or indirectly, under AMVAC's ownership, control, or custody, wherever the products are located. This Order extends to any pesticide products with alternate brand names, products distributed under supplemental registrations, and products distributed or sold subject to the provisions of FIFRA Sections 18 and 24(c).

EPA has reason to believe, based on information provided by AMVAC and on tests performed by EPA on samples of PCNB product provided by AMVAC, that this pesticide and any other products derived from this pesticide may contain impurities of toxicological significance. In particular, the pesticide, Technical Grade PCNB 95% (EPA Registration Number 5481-197) does not adequately express the composition of the product as required by FIFRA Section 3 and 40 Code of Federal Regulations (CFR) § 158.320 of its implementing regulations.

This Order extends to all quantities and sizes of this potentially violative pesticide and to any other product, including technical grade, manufacturing use pesticides, and any end-use pesticides, directly or indirectly derived from this product. *The Order is effective immediately upon receipt.*

Section 13(a) of FIFRA, 7 U.S.C. § 136k(a), authorizes the Administrator of EPA to issue an order prohibiting the sale, use, or removal of any pesticide by any person who owns, controls, or has custody of such pesticide whenever there is reason to believe the pesticide is in violation of any provision of FIFRA or has been or is intended to be distributed or sold in violation of any provision of FIFRA. EPA has reason to believe AMVAC and AMVAC Chemical Corporation have distributed and sold, and intend to continue to distribute and sell violative pesticide products.

Please submit a written proposal for proper disposition and inventory of the products subject to this Order within 10 days of receipt of this Order. If you have any questions about this matter or wish to request an informal conference to discuss these alleged violations, you may contact Yvette P. Hellyer, Enforcement Case Officer, Pesticides and Tanks Enforcement Branch, Waste and Chemical Enforcement Division, at USEPA Headquarters, 1200 Pennsylvania Avenue (2249A), Washington, DC 20460, or by telephone at (202) 564-4033. For any legal matters concerning this Order, please contact Thomas Charlton, Attorney, at the same address, or by telephone at (202) 564-6960.

Sincerely,

Rosemarie A. Kelley, Director
Waste and Chemical Enforcement Division

cc: Mr. Jon C. Wood,
    AMVAC Director of Regulations

Enclosure

2

## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
## HEADQUARTERS

| | | |
|---|---|---|
| *In the Matter of:* | ) | |
| | ) | **STOP SALE, USE OR** |
| **American Vanguard Corporation (AMVAC)** | ) | **REMOVAL ORDER** |
| **4695 MacArthur Court, Suite 1250** | ) | |
| **Newport Beach, CA 92660** | ) | **Docket No. FIFRA-HQ-2010-5021** |
| | ) | |
| ___Respondents...___ | ) | |

### I. AUTHORITIES

1. Section 13(a) of the Federal Insecticide, Fungicide and Rodenticide Act, as amended, (FIFRA), 7 U.S.C. § 136k(a), authorizes the Administrator of the United States Environmental Protection Agency (USEPA or EPA) to issue an order prohibiting the sale, use, or removal of any pesticide or device by any person who owns, controls, or has custody of such pesticide or device whenever there is reason to believe, *inter alia,* the pesticide or device is in violation of FIFRA, or the pesticide or device has been or is intended to be distributed or sold in violation of FIFRA.

2. This authority has been delegated from the EPA Administrator to the Director of the Waste and Chemical Enforcement Division, Office of Civil Enforcement, Office of Enforcement and Compliance Assurance, EPA.

3. Section 12(a)(1)(C) of FIFRA, 7 U.S.C. § 136j(a)(1)(C), states it shall be unlawful for any person in any state to distribute or sell to any person any registered pesticide the composition of which differs at the time of its distribution or sale from its composition as described in the statements required in connection with their registration under Section 3 of FIFRA.

4. Section 12(a)(2)(I) of FIFRA, 7 U.S.C. § 136j(a)(2)(I), states it shall be unlawful for any person to violate any order issued under Section 13 of FIFRA.

5. Section 2(s) of FIFRA, 7 U.S.C. § 136(s), defines a "person" as any individual, partnership, association, corporation, or any organized group of person whether incorporated or not.

6. Section 2(gg) of FIFRA, 7 U.S.C. § 136(gg), defines "to distribute or sell" as to distribute, sell, offer for sale, hold for distribution, hold for sale, hold for shipment, ship,

deliver for shipment, release for shipment, or receive and (having so received) deliver or offer to deliver.

7. Section 2(u) of FIFRA, 7 U.S.C. § 136(u), defines a "pesticide" as any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest. *See also* 40 Code of Federal Register (CFR) § 152.15.

8. 40 CFR § 158.300 defines "impurity" as any substance (or group of structurally similar substances if specified by the Agency), in a pesticide product other than an active ingredient or an inert ingredient, including unreacted starting materials, side reaction products, contaminants, and degradation products.

9. 40 CFR § 158.300 defines "impurity associated with an active ingredient" as (1) any impurity present in the technical grade of active ingredient; and (2) any impurity which forms in the pesticide product through reactions between the active ingredient and any other component of the product or packaging of the product.

10. American Vanguard Corporation (AMVAC), located in Newport Beach, California, is the parent corporation of AMVAC Chemical Corporation.  It is a "person" within the definition of FIFRA.

11. AMVAC Chemical Corporation, located at 4100 East Washington Boulevard, Los Angeles, California, 90023, is an operating subsidiary of AMVAC and is a "person" within the definition of FIFRA.

12. AMVAC Chemical Corporation is the registrant of record for the EPA company number "5481" and is a "person" within the definition of FIFRA.

13. This Order refers to AMVAC, AMVAC Chemical Corporation, and all their divisions, offices, branches, subsidiaries, and affiliates collectively as the "Respondents."

## II. BACKGROUND AND BASIS FOR ORDER

14. AMVAC is the registrant for the pesticide product, Technical Grade PCNB 95% with EPA Registration Number 5481-197.  The active ingredient is pentachloronitrobenzene, with CAS Number 82-68-8.

15. On January 4, 2010, AMVAC submitted samples of its pesticide product, Technical Grade PCNB 95% (EPA Reg. No. 5481-197), to the USEPA Environmental Chemistry Laboratory located at Stennis Space Center in Mississippi.

2

16. Analytical results dated January 21, 2010, for the January 4, 2010 samples confirmed the presence of Impurity X, a substance or class of substances known to be of toxicological significance. (Note: Impurity X information is protected by FIFRA confidential business information.)

17. On January 29, 2010, AMVAC submitted test data to the USEPA Office of Pesticide Programs documenting the presence of Impurity X, a substance or class of substances known to be of toxicological significance, in its pesticide product, Technical Grade PCNB 95% (EPA Reg. No. 5481-197).

18. The Confidential Statement Formula (CSF) for Technical Grade PCNB 95% (EPA Reg. No. 5481-197), submitted by AMVAC on January 10, 2005, did not identify the presence of Impurity X in the product and therefore did not adequately express the composition of the product as required by Section 3 of FIFRA and 40 CFR § 158.320 of its implementing regulations.

19. EPA has reason to believe the CSF submitted by AMVAC to EPA for Technical Grade PCNB 95% (EPA Reg. No. 5481-197) is not an accurate representation of the product's current contents.

20. Any distribution or sale of any registered pesticide product for which the CSF does not accurately reflect the composition of the product is a violation of FIFRA Section 12(a)(1)(C), 7 U.S.C. 136 § 136j(a)(1)(C). In accordance with 40 CFR § 158.320, the information required to accompany the application, including information on toxicologically significant impurities of the product, must be provided.

21. Under FIFRA and its implementing regulations, neither a change of manufacturing process or formula may be done as a notification under 40 CFR § 152.46, but must instead be done by submission of an amendment request. No product can be distributed or sold under the new process or composition, unless the Agency approves the amendment request.

22. Based on the presence of Impurity X in Technical Grade PCNB 95% (EPA Reg. No. 5481-197), EPA has reason to believe the CSF does not accurately reflect the composition of the product, Technical Grade PCNB 95% (EPA Reg. No. 5481-197) and any pesticide product formulated, or directly or indirectly derived from, or from the same source of PCNB active ingredient. Furthermore, EPA believes AMVAC has been selling

3

and distributing pesticides for which the composition differs in violation of Section 12(a)(1)(C) of FIFRA, 7 U.S.C. § 136j(a)(1)(C).

### III. ORDER

23. The Respondents are hereby ordered to **immediately** cease the distribution, sale, or use of Technical Grade PCNB 95% (EPA Reg. No. 5481-197) and any PCNB-containing pesticide products derived from the technical grade pesticide or from the same source of PCNB active ingredient (collectively, the "violative pesticide products") which are in the ownership, control, or custody of the Respondents, wherever the violative pesticide products are located.

24. This Order shall extend to all violative pesticide products with alternate brand names, products distributed under supplemental registrations, and products distributed or sold subject to provisions of FIFRA Sections 18 or 24(c).

25. This Order applies to all quantities and sizes of violative pesticide products intended for sale or distribution in the domestic market.

26. The violative pesticide products shall not be used, sold, offered for sale, held for sale, shipped, delivered for shipment, received, or having been so received, shall not be delivered, offered for delivery, moved, or removed for disposal from any facility or establishment of the Respondents, for any reason, other than in accordance with the provisions of this Order or such further Orders as may be issued by EPA in connection with the violative pesticide products.

27. Within 10 days of receipt of the Order, Respondents must submit a written proposal for proper disposition of all violative pesticide products subject to this Order. The proposal shall include an inventory of detailed accounting of each product by EPA Registration Number (if applicable), brand name(s), unit packaging size(s), quantity, and locations(s) products are being held. The proposal and inventory shall be submitted to the following person, or to such other person as EPA designates in writing:

> *Attn:* Mr. Thomas Charlton, Attorney/Advisor
> US Environmental Protection Agency
> Office of Enforcement and Compliance Assurance (2249A)
> 1200 Pennsylvania Avenue, NW
> Room 5041
> Washington, DC 20460-0001.

28. Respondents may remove or may ship, for purposes of consolidation and/or disposal, the violative pesticide products in compliance with federal, state, and local laws and regulations for such disposal, provided EPA approves in writing that such disposal can occur. Any such movement of product subject to this Order shall be documented and reported to EPA by identifying EPA Registration Number, brand name, quantities, locations, and ultimate disposition of the product involved.

29. Respondents must create and maintain an inventory of all stocks of these violative pesticide products. Such inventory must include information on the amount and location of such stocks. Respondent must provide written updates to EPA of the inventory upon request. Updates of the inventory shall be submitted to Mr. Charlton or such other person as EPA designates in writing.

30. Any agent, owner, or operator of the Respondents violating the terms or provisions of this Order may subject the violator to civil or criminal penalties as prescribed in the Section 14 of FIFRA, 7 U.S.C. §136*l*.

31. The issuance of this Order shall not constitute a waiver by EPA of its remedies, either judicial or administrative, under FIFRA or any other Federal environmental law, to address this matter or any other matters or unlawful acts not specified in this Order.

32. This Order shall be EFFECTIVE IMMEDIATELY upon receipt by Respondents.

33. This Order shall remain in effect until after EPA vacates the Order in writing.

## IV. OTHER MATTERS

34. For additional information, contact Yvette P. Hellyer, Enforcement Case Officer, at (202) 564-4033, and for any legal matters, contact Thomas Charlton, Attorney, at (202) 564-6960, in the Pesticides and Tanks Enforcement Branch.

Rosemarie A. Kelley, Director
Waste and Chemical Enforcement Division
Office of Civil Enforcement

Date: 8/12/10

**Docket No. FIFRA-HQ-2010-5021**
**STOP SALE, USE OR REMOVAL ORDER**