## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN VANGUARD CORPORATION, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No.** |
| **v.** ) | |
| ) | |
| **LISA P. JACKSON,** *et al.* ) | |
| ) | |
| **Defendants.** ) | |

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff American Vanguard Corporation ("AMVAC") submits this Memorandum of Points and Authorities in Support of its Application for Temporary Restraining Order and Preliminary Injunction.

## I.    INTRODUCTION

AMVAC seeks a temporary restraining order and preliminary injunction to prevent the Defendants (collectively, "EPA") from enforcing an August 12, 2010 Stop Sale, Use, and Removal Order ("SSURO") (Exhibit 1) purportedly issued by EPA under the Federal Fungicide, Insecticide and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136-136y.  The SSURO effectively revokes AMVAC's licenses to sell a pesticide product that has been registered and approved by EPA and sold throughout the United States since 1985.  The product prevents "snow mold" fungus which harms and kills grass.  The SSURO was issued to AMVAC without any prior notice or opportunity to be heard and has already begun to irrevocably destroy a multi-million dollar business.  Customers have already started canceling orders for the product.  The SSURO requires that AMVAC immediately cease selling, and collect and destroy a product that is sold

principally in August and September and that is only effective if applied in October and November. The SSURO asserts no imminent or other danger to the public from the product. Rather, it alleges (incorrectly) a paper work error - that AMVAC failed to include on the Confidential Statement of Formula ("CSF") for the product, a reference to trace amounts of an impurity[1] that is neither an active ingredient nor necessary for the product, but rather is unintentionally created in the manufacturing process. AMVAC disclosed the presence of this impurity to EPA in 1993. Since that disclosure, EPA has approved the CSF for the product on two subsequent occasions, and in neither instance was this trace impurity identified. EPA never told AMVAC that the levels of this impurity require that it be included in the CSF. Moreover, since January of this year, AMVAC has actively pressed EPA to address any issues regarding the presence of this impurity. EPA, however, sat on its hands. It was well aware that AMVAC was manufacturing and building its inventory to be sold during a short Fall window. Nonetheless, EPA opted to lie in wait until the height of the sales season for the product to issue the SSURO and did so without any prior notice to AMVAC or opportunity to be heard and without making the requisite determinations prior to the exercise of this destructive and extraordinary authority. EPA, in addition to issuing the SSURO, has published a website containing its incorrect and unsupported claims, has reached out to AMVAC's customers, and has told states so that they too would cancel their approvals for AMVAC's product. One state, New Mexico, has already done so based solely on the improper EPA action.

AMVAC is more than likely to prevail on the merits. The law requires that EPA provide notice to AMVAC and an opportunity to be heard before the agency can revoke AMVAC's

---

[1]   As indicated by EPA's SSURO, the identity of this impurity ("Impurity X") is protected as confidential business information. As such, it has not been identified in AMVAC's filings. Should the Court require submission of additional information regarding Impurity X, AMVAC respectfully requests leave to make any such submissions under seal.

license for the product. EPA failed to do so here.  There is no factual basis or record to support

the agency's action.  It appears that EPA may have timed the issuance of the SSURO to destroy

AMVAC's business.  EPA can point to no public interest that would justify its tactics.  The

agency never alleged or made any findings before issuing the SSURO that FIFRA was being

violated, nor has it alleged any harm to public health or to the environment if the product remains

in the marketplace.

## II.    REGULATORY AND FACTUAL BACKGROUND

### A.    The Federal Fungicide, Insecticide and Rodenticide Act ("FIFRA").

Under FIFRA, 7 U.S.C. §§ 136-136y, a person may sell a pesticide only after registration

by EPA.  7 U.S.C. § 136a.  Registration under FIFRA requires the applicant to submit extensive

information about the pesticide product, including, *inter alia*, a complete formula for the

pesticide.  Applicants submit a Confidential Statement of Formula ("CSF") that contains

information about the active ingredient, inert ingredients, and "impurities."  "Impurities" are

defined in FIFRA's implementing regulations as any substance, or group of structurally similar

substances if specified by EPA, in a pesticide product other than an active ingredient or an inert

ingredient, including unreacted starting materials, side reaction products, contaminants, and

degradation products.  *See* 40 C.F.R. § 158.300.  Under EPA's regulations, a registrant is

required to submit information concerning an impurity that is inadvertently created in the

manufacturing process as part of its composition statement only in certain circumstances.

Information on each impurity that is "found to be present in any sample of the product at a level

$\geq 0.1$ percent by weight" is required by 40 C.F.R. § 158.320(d).  In addition, information for

each impurity that "is determined by EPA to be toxicologically significant" is required by 40

C.F.R. § 158.320(c). The term "toxicologically significant" is not defined in any law or regulation. Only this latter provision is at issue here.

EPA must register a pesticide if the statutory requirements for registration are met. *See* 7 U.S.C. § 136a(c)(5). Once a pesticide product registration is approved by EPA, the registration acts as a license to market and sell the product subject to certain restrictions. *See, e.g., Reckitt Benckiser, Inc. v. EPA*, No. 09-1314 Consolidated with No. 09-5437, 2010 U.S. App. LEXIS 14646, *3 (D.C. Cir. July 16, 2010) ("A FIFRA registration is a product-specific *license* describing the terms and conditions under which the product can be legally distributed, sold, and used," citing 7 U.S.C. § 136a(a), (c)-(e)) (emphasis added). Under Section 3(f)(2) of FIFRA, "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2).

Section 6(a)(2) of FIFRA, 7 U.S.C. § 136d(a)(2), states that "[i]f at any time after the registration of a pesticide the registrant has additional factual information regarding unreasonable adverse effects on the environment of the pesticide, the registrant shall submit such information to the Administrator." Section 12(a)(1)(C) of FIFRA, 7 U.S.C. § 136j(a)(1)(C), makes it unlawful for any person to distribute or sell any registered pesticide if the composition of the product differs at the time of its distribution or sale from its composition as described in the statements required in connection with its registration. Section 13(a) of FIFRA, 7 U.S.C. § 136k(a), authorizes the Administrator of EPA to issue an order - an SSURO - prohibiting the sale, use or removal of any pesticide by any person whenever there is reason to believe that the pesticide is in violation of any provision of FIFRA or has been, or is intended to be, distributed or sold in violation of any provision of FIFRA. These SSUROs, if issued with respect to a

registered product, can effectively revoke the license for the registered product even though it is in full conformity with the terms and conditions of its registration.

### B.    AMVAC'S Approved Technical Grade PCNB.

AMVAC is in the business of manufacturing, distributing, and selling a variety of agricultural products, including but not limited to herbicides, insecticides, and fungicides. One of AMVAC's product lines is based on an active ingredient called "Technical Grade PCNB."[2] Technical Grade PCNB has been a FIFRA-registered pesticide product (EPA Registration No. 5481-197) since October 10, 1985. The active Ingredient in Technical Grade PCNB is pentachloronitrobenzene or "PCNB." It is the Technical Grade PCNB that is at issue here. *See* SSURO, *In re AMVAC*, No. FIFRA-HQ-2010-5021 (EPA August 12, 2010), attached hereto as Exhibit 1, at ¶ 14; *see also* Declaration of Ian Chart, attached hereto as Exhibit 2, at ¶ 4.

Technical Grade PCNB is manufactured at a unit of AMVAC's facility located in Commerce, California, near Los Angeles. *See* Declaration of David Johnson, attached hereto as Exhibit 3, at ¶ 5. Technical Grade PCNB was originally registered as "Technical Grade PCNB 95%" with an Active Ingredient ("AI") label concentration of 95% by weight. Declaration of Jon Wood, attached hereto as Exhibit 4, at ¶ 4.

PCNB products are primarily used in non-crop applications to prevent so-called "snow mold" fungus growth on golf course fairways and greens. It is effective if applied in late October and November. Exhibit 2 at ¶ 4. When applied correctly, these products prevent potentially significant damage and destruction of turf, and thus help users avoid the need to use

---

[2]    In addition, each separate product that uses Technical Grade PCNB is separately registered.

more and different fertilizers, herbicides, and pesticides to repair and replace the turf. Declaration of Jeffrey Alvis, attached hereto as Exhibit 5, at ¶ 3.

In 1993, AMVAC detected trace quantities of Impurity X in its Technical Grade PCNB products. By letter dated July 2, 1993, AMVAC notified EPA about these trace quantities of Impurity X.[3] EPA never responded to AMVAC's letter. Exhibit 2 at ¶ 5. The amounts detected were far below the level (> 0.1 percent by weight) that automatically require inclusion in the CSF under 40 C.F.R. § 158.320(d). Exhibit 2 at ¶ 10. EPA never determined that these trace amounts were "toxicologically significant" so as to require inclusion in the CSF under 40 C.F.R. § 158.320(c). AMVAC believes that they were not and are not toxicologically significant. *Id.* ¶¶ 9-14.

On two occasions following the submittal of its July 2, 1993 notice to EPA, AMVAC filed CSFs with EPA for Technical Grade PCNB, as FIFRA requires. First, in early 1999, AMVAC changed the concentration of the active ingredient in Technical Grade PCNB products to 96.2%. Exhibit 4 at ¶ 5. AMVAC prepared and submitted a CSF to EPA for review and approval to support this change. *Id.* After some give and take regarding the label, EPA responded by stating that the revised CSF could not be accepted until a revised product label was submitted. *Id.* AMVAC revised the label accordingly and EPA approved of the revised label in

---

[3]     AMVAC's 1993 submission was precautionary and voluntary and was made in the context of an interpretive rule issued by EPA on September 20, 1985 and in effect at the time. That rule provided a far more uncertain context for 6(a)(2) submissions than the regulation subsequently promulgated in 1997. The current rule, moreover, does not require the submission made by AMVAC in 1993, because there has not been the requisite determination by EPA that the impurities are "toxicologically significant." 40 C.F.R. § 159.179(b). What matters, however, is not whether AMVAC was *obligated* to make the submission, but the fact that AMVAC made the 1993 submission and provided EPA with actual notice of the presence of trace amounts of Impurity X in PCNB.

writing in December of 1999. *Id.* Impurity X was not identified in the CSF at this time. *Id.* ¶ 9. It was, however, known to EPA from the 1993 Notice.

On January 10, 2005 AMVAC prepared a second CSF to submit to EPA. This second CSF was amended to reflect that AMVAC would be a supplier of Technical Grade PCNB. The amendment did not change any of the listed chemicals or percent weights of individual ingredients. This second CSF was approved by EPA by letter dated April 21, 2005. Exhibit 4 at ¶ 7. Once again, although Impurity X was not identified in the CSF, the CSF did identify other impurities. Exhibit 2 at ¶ 5.

In addition to the two CSF submissions, in 2003, AMVAC sought to revise its Technical PCNB registration to make changes unrelated to the current controversy. The study and proposed revised label were submitted to EPA. On December 11, 2003, EPA approved the revised label, subject to certain edits being made. Exhibit 4 at ¶ 6. Again, there was no suggestion that the CSF needed to be amended to include Impurity X, nor was it.

In December 2009, well prior to the seasonal application of Technical Grade PCNB products to turf, AMVAC contacted EPA to address the Impurity X issue. AMVAC told EPA that it had initiated an Impurity X data collection and manufacturing process review for Technical Grade PCNB because the company did not want the impurity to be present regardless of its levels. Samples of Technical Grade PCNB were sent to an outside laboratory for Impurity X analysis in January of 2010. Sample results from the January 2010 Technical Grade PCNB analysis were sent to EPA in March of 2010 (the turn-a-round time for Impurity X sample analysis is several weeks or more), along with other materials. Exhibit 2 at ¶ 8. The data submitted showed that Impurity X was not present in amounts that would require that it be included on the CSF under 40 C.F.R. § 158.320(d). Exhibit 2 at ¶ 10. Further, EPA did not

determine at that time that the reported trace amounts of Impurity X were toxicologically significant.[4]

An initial teleconference between AMVAC and EPA officials was held in April of 2010. During the call, AMVAC reminded EPA that it had made the Impurity X submission in 1993. Jill Bloom, EPA's Review Manager, said that the agency was well aware of this notification. Exhibit 2 at ¶ 9. The call focused on the PCNB manufacturing process, including where in that process Impurity X may have been generated. At no time during the call did EPA indicate that the trace amounts of Impurity X detected in Technical Grade PCNB was of toxicological significance. EPA, moreover, never indicated that the CSF supporting the Technical Grade PCNB pesticide registration needed to be amended or that the agency was considering issuing a SSURO for this product. The call ended with AMVAC stating that it would be investigating its Technical Grade PCNB manufacturing process to determine how Impurity X, which is not found in the raw materials used to manufacture Technical Grade PCNB, was being generated, and to explore solutions to this situation. The EPA officials on the call seemed satisfied with AMVAC's proposed action plan. Exhibit 2 at ¶ 9.

During the next few weeks, AMVAC continued to sample portions of its inventory of Technical Grade PCNB and send the samples to its contract laboratory for Impurity X analysis. Sample result analysis results revealed extremely low levels Impurity X - far below the 0.1% level that would require that the impurity be listed on the CSF. *See* 40 C.F.R. § 158.320(d).[5]

---

[4]     The regulation requiring inclusion of this type of impurity based on a determination of "toxicological significance," 40 C.F.R. § 158.320(c), was amended in 2007. Prior to that date, the regulation was silent as to *who* made that determination. The amendment answered that question by adding the phrase "is determined by EPA" to 40 C.F.R. § 158.320(c). *See* 72 Fed. Reg. 60934, 60971 (Oct. 26, 2007).

[5]     To AMVAC's knowledge and belief, these levels are below "action" levels under any current federal regulatory program.

AMVAC's process chemists also continued to investigate how this impurity could have been generated in the Technical Grade PCNB manufacturing process. At the same time, AMVAC considered how it might modify the manufacturing process to remove the impurity, while at the same time ensuring that the final product remained within specifications. Even though Impurity X was present in amounts far below the 0.1% level that would require it be listed, AMVAC's goal, if it could not eliminate Impurity X in its entirety from the product, was to reduce Impurity X to the lowest, commercially-practicable levels. Exhibit 2 at ¶ 10.

At AMVAC's request, a follow-up meeting with EPA was held on June 3, 2010, to discuss AMVAC's progress in addressing the Impurity X issue. Again, EPA was informed that only very, very small quantities of Impurity X are unintentionally formed in the manufacture of the crude PCNB and that changes to the current PCNB manufacturing process were being considered. EPA was also informed that: (i) AMVAC was the only registered PCNB manufacturer in North America; (ii) the Technical Grade PCNB manufacturing process is extremely complex and would require months of downtime if there were a change in process; (iii) Technical Grade PCNB inventories had to be kept built up (about 3 million pounds) to adequately serve customers when the sales season began in August; (iv) the current Technical Grade PCNB inventory was being sampled for Impurity X on a Lot basis; and (v) the formulation/technical relationship between PCNB manufacture and Impurity X formation was actively being investigated. Exhibit 2 at ¶ 11.

EPA did not ask questions nor did it discuss any acceptable or unacceptable Impurity X levels associated with Technical Grade PCNB. Exhibit 2 at ¶ 12. EPA appeared satisfied with the steps that AMVAC was taking to address the low levels of Impurity X. EPA never indicated that the Impurity X analysis results AMVAC had provided to the agency suggested

"toxicological significance."  EPA never alleged that AMVAC's CSF was in any respect in violation of FIFRA, or that it was considering issuing an SSURO involving AMVAC's PCNB product line.  Exhibit 2 at ¶ 12.

Between June 3, 2010 and the issuance of the SSURO on August 12, 2010, EPA did not contact AMVAC regarding whether Impurity X should be referenced on the CSF.  *See* Exhibit 2 at ¶ 14.  Application of PCNB Products typically must occur between October and November.  Therefore, given delivery schedules, approximately 80% of PCNB products are sold in September and early October.  Exhibit 5 at ¶ 4.

On August 12, 2010, without prior notice to AMVAC and without any opportunity to be heard, EPA issued an SSURO ordering AMVAC to <u>immediately</u> cease all sales and distribution of Technical Grade PCNB products.  Exhibit 1.

The SSURO does not allege that Impurity X, as it exists as a trace impurity in AMVAC's PCNB products, is of "toxicological significance."  Rather, the SSURO alleged, for the first time, that Impurity X is generally a "substance or class of substances known to be of toxicological significance."  *See* Exhibit 1 at ¶ 16.  The SSURO also alleges, for the first time, that the formula used for Technical Grade PCNB products sold by AMVAC differed from the formula submitted to EPA in CSFs as a part of the registration process.  *Id.* at ¶¶ 18-22.  Based on this premise alone, EPA claimed that sales of PCNB products violated Section 12(a)(1)(C) of FIFRA.  *Id.*  The SSURO required AMVAC to submit, within 10 days of its receipt, a proposal for the proper disposition of PCNB products.  *Id.* at ¶ 27.  The proposal was required to include an "inventory of detailed accounting of each product by EPA Registration Number (if applicable), brand name(s), unit packaging size(s), quantity, and location(s) products are being stored."  *Id.*  This information has been provided.

Prior to issuing the SSURO, EPA provided no notice to AMVAC that (1) it determined Impurity X to be an impurity of "toxicological significance" within the meaning of 40 C.F.R. § 158.320(c), (2) that the agency believed the presence of Impurity X required an amended CSF for Technical Grade PCNB products, or (3) that it thought AMVAC was violating FIFRA. The agency did not disclose the basis for its decision nor did it share whatever data it might have to support the allegations in the SSURO.

To assure immediate destruction of AMVAC's PCNB business, EPA has also advised states of the SSURO and at least one (New Mexico) has, based solely on this order, cancelled its state-issued registration of Technical Grade PCNB.  *See* E-mail from Robert Avalos, New Mexico Dept. of Agriculture, to Carol Baumgartner, AMVAC (August 19, 2010 1:05 PM), attached hereto as Exhibit 6.  EPA has also posted a website regarding the SSURO and containing the agency's incorrect and unsupported claims.[6]

## III.   ARGUMENT

The Administrative Procedure Act provides that this Court may enjoin the SSURO pending judicial review:

> On such conditions as my be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of any agency action or to preserve the status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705.

The standards for enjoining agency action under this provision are the same as those for a preliminary injunction.  AMVAC will show that: (i) it is likely to succeed on the merits; (ii) it

---

[6]   *See* http://www.epa.gov/compliance/resources/cases/civil/fifra/americanvanguard.html

will suffer immediate, irreparable harm if the requested relief is denied; (iii) EPA will not be injured if the SSURO is enjoined; and (iv) the public interest will not be harmed. *See generally Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1066 (D.C. Cir. 1998); *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 27 (D.D.C. 1997); *Morgan Stanley DW, Inc. v. Rothe*, 150 F. Supp. 2d 67, 72-73 (D.D.C. 2001). As this Court has explained:

> These four factors are not considered in isolation from one another, and no one factor is necessarily dispositive as to whether preliminary injunctive relief is warranted. Rather, the factors interrelate on a sliding scale and must be balanced against each other.... Thus, a particularly strong showing on one factor may compensate for a weak showing on one or more of the other factors.... A strong showing of likely success on the merits may warrant issuance of preliminary injunctive relief even if the plaintiff makes a less compelling showing on the other three factors.

*Morgan Stanley,* 150 F. Supp. 2d at 72-73 (internal quotations and citations omitted). All criteria are met here.

### A.   AMVAC Will Suffer Immediate And Irreparable Harm If The SSURO Is Allowed To Remain In Effect Pending Review.

The SSURO issued with respect to AMVAC's Technical Grade PCNB products was issued at a time during the calendar year that causes the company the greatest possible damage. The practical effect of the SSURO is to completely and irrevocably destroy AMVAC's market for non-crop fungicide, at a minimum, for this year, and potentially forever.[7]

PCNB products are, as noted above, used primarily on golf courses and other turf applications to prevent the incidence of "snow mold" fungus. Snow mold occurs in areas subject

---

[7]    Counsel has very recently learned that this sort of business-destroying tactic has been tried before by the EPA when issuing a SSURO. It is counsel's understanding that in *Biolab, Inc., v. EPA*, No. 98-cv-01113 (D.D.C.), Judge Lamberth issued a temporary restraining order to prevent enforcement of an SSURO issued to a company selling a product, that was *not registered at all*. In that case, we are advised that EPA, as it did here, issued the SSURO at the beginning of the company's selling season and, unlike in this case, provided *some* prior notice to the company before issuing the SSURO. Counsel for AMVAC is endeavoring to obtain copies of these papers.

to snowfall and has deleterious effects on the health of grass and turf. This material can destroy turf. Exhibit 5 at ¶ 3. To be effective, PCNB products must be applied in early fall, from October through early November. To be delivered in time for effective application, therefore, most customers order PCNB products in August and September. The SSURO prohibits AMVAC from filling orders from customers that they are receiving each and every day. Exhibit 5 at ¶ 4. Right now is when orders for these products come in and they are expected to be filled immediately so that the product can be timely applied. Exhibit 5 at ¶ 4; Declaration of Glen Anderson, attached hereto as Exhibit 8, at ¶ 5-6.

According to AMVAC's Chief Financial Officer, the adverse monetary impact of the SSURO will be in the millions of dollars. Exhibit 3 at ¶ 4. Customers have apparently become aware of the issuance of the SSURO and have started to cancel orders for the product as recently as yesterday. Exhibit 8 at ¶ 7, Attachments A & B. Unrecoverable loss of business constitutes irreparable injury. *Doran v. Salem Inn., Inc.*, 422 U.S. 922, 932 (1975); *Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238 (S.D.N.Y. 2000). Loss of customer goodwill and business reputation also constitutes irreparable injury. *See Washington Metropolitan Area Transit Com. v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977); *Anonymous v. FDIC*, 619 F. Supp. 866, 874-75 (D.D.C. 1985); *see also Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) ("by its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable") (citations omitted); *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551-52 (4th Cir. 1994) ("the threat of a permanent loss of customers and the potential loss of goodwill...support a finding of irreparable harm").

**B.    AMVAC Is Likely To Succeed On The Merits.**

By issuing a SSURO for PCNB products, EPA has effectively suspended AMVAC's licenses for its registered PCNB products. It has done so without providing any pre-deprivation notice and hearing, without providing any scientific rationale, and without affording AMVAC any opportunity to make any necessary adjustments in its registrations. By effectively suspending AMVAC's registrations without any prior notice, EPA has violated the statutory due process protections of FIFRA, Section 558 of the Administrative Procedure Act, 5 U.S.C. § 558, and AMVAC's Fifth Amendment due process rights.

A registrant is entitled to rely upon the basic legitimacy of a FIFRA product registration granted by EPA, particularly when EPA has received actual notice of all relevant facts and repeatedly approved the registration on that basis. Section 3(f)(2) expressly recognizes this proposition: "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2). If EPA decides that a registration no longer meets the requirements of FIFRA, the correct procedure is to inform the registrant of the specific changes it believes need to be made and give the registrant notice and opportunity to respond before ordering that the product and business be destroyed. FIFRA establishes in Sections 6(b)and 6(c) the mechanisms by which EPA can compel the registrant to make changes if it declines to do so voluntarily. *See* 7 U.S.C. §§ 136d(b) (cancellation and change in classification) & (c) (suspension). Here, by issuing a SSURO that has the effect of terminating AMVAC's registrations for PCNB products, EPA has ignored the legitimacy of those

registrations and has side-stepped the process, and attendant procedural protections, afforded

AMVAC by Sections 6(b) and 6(c) of FIFRA.[8]

By effectively suspending AMVAC's registrations without any prior notice, EPA has

also violated Section 558 of the APA, which provides in relevant part:

> Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefore, the licensee has been given —
>
> (1) notice by the agency in writing of the facts or conduct which may warrant the action; and
>
> (2) opportunity to demonstrate or achieve compliance with all lawful requirements.

5 U.S.C. § 558(c).

For purposes of the APA, "license" is defined broadly to include "the whole or part of an

agency permit, certificate, approval, registration, charter, membership, statutory exemption or

other form of permission." 5 U.S.C. § 551(8).  It cannot be reasonably disputed by EPA that

AMVAC's licenses for its registered PCNB products meet this definition. *See Reckitt*, 2010 U.S.

App. LEXIS 14646, at *3 ("A FIFRA registration is a product-specific *license* describing the

terms and conditions under which the product can be legally distributed, sold, and used," citing 7

U.S.C. § 136a(a), (c)-(e)) (emphasis added); *Washington Toxics Coalition v. EPA*, No. C01-

132C, 2002 U.S. Dist. LEXIS 27654, *25 (W.D. Wash. July 2, 2002) ("EPA describes a

registration as 'a license which establishes the terms and conditions under which the pesticide

---

[8]     AMVAC can only speculate as to why EPA chose to issue an SSURO as opposed to a suspension order or other remedy.  Nevertheless, it is noteworthy that, pursuant to 7 U.S.C. § 136m, a party who suffers a loss with respect to a suspended registration is entitled to indemnification from EPA.  There is no corresponding indemnification provision for an SSURO that causes a loss.  A suspension order requires the agency to assert the presence of an imminent hazard, and even in that context prior notice is required.  7 U.S.C. § 136d(c).

product may be lawfully sold, distributed, or used.'"); *see also Air North America v. Dept. of Transp.*, 937 F.2d 1427, 1436-38 (9th Cir. 1991) (definition of license in the APA context is "extremely broad."); *Atlantic Richfield Co. v. United States*, 774 F.2d 1193, 1199-1202 (D.C. Cir. 1985) (Maritime Administration approvals for conditional entry in Alaskan-Panama Canal domestic oil trade held to be APA-protected licenses); *Gallagher & Ascher Co. v. Simon*, 687 F.2d 1067, 1072-76 (7th Cir. 1982) (permits issued pursuant to Customs regulations allowing for expedited entry of certain imports constituted licenses under the APA). "Agency" is defined as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency, [with certain exceptions, not relevant here]." 5 U.S.C. § 551(1). EPA comes within this definition.

Thus, unless one of the exceptions in section 558(c) applies in this case, AMVAC was entitled to written notice by EPA and to an opportunity to demonstrate or achieve compliance with lawful requirements, prior to the institution of proceedings to revoke its licenses for its registered PCNB products, and certainly prior to an order that summarily and immediately revokes the license.

> Section 558(c) "is designed to preclude the withdrawal of licenses, except in cases of willfulness or the stated cases of urgency, without affording the licensee an opportunity for the correction of conduct questioned by the agency."

Administrative Procedure Act: Legislative History, S. Doc. No. 248, 79th Cong., 2d Sess. 35 (1946). *See also* Attorney General's Manual on the Administrative Procedure Act 90-91 (1947) ("This sentence requires an agency to give a licensee *an opportunity to change his conduct before his license can be revoked by the agency unless the licensee's conduct is willful or the public health, interest or safety requires otherwise.* Thus, if a particular licensee should under ordinary circumstances transcend the bounds of the privilege granted to him, the agency which

has granted him the license *must inform him in writing of such conduct and afford him an opportunity to comply* with the requirements of the agency before it can revoke, withdraw, suspend or annul his license.") (emphasis added).

In *The Blackwell College of Business v. Attorney General*, 454 F.2d 928 (D.C. Cir. 1971), the D.C. Circuit found that Section 558(c) had as a purpose to provide a licensee threatened with the termination of its license an opportunity to correct its transgressions before actual suspension or revocation of its license resulted. 454 F.2d at 933-34. The court stated: "[t]he Administrative Procedure Act seems clearly to contemplate that when there is a withdrawal sanction possibly to be imposed, one holding a license ... be afforded an opportunity to put its house in lawful order *before* more formal agency proceedings are undertaken." *Id.* (emphasis added). *Accord Gallagher*, 687 F.2d at 1074; *Atlantic Richfield*, 774 F.2d at 1200-1201.

Here, there has been no finding by EPA that AMVAC willfully violated the terms of licenses for its registered PCNB products, nor has EPA made any finding that "public health, interest, or safety" exempted the SSURO from the provisions of Section 558(c) on notice and opportunity to correct.[9] Because none of the exceptions to Section 558(c) were invoked, EPA was required by Section 558(c) to give AMVAC notice in writing of the facts or conduct that may have warranted the revocation of its licenses and an opportunity to demonstrate or achieve

---

[9]     The phrase "public health, interest, or safety" in 5 U.S.C. § 558(c) is rarely invoked in license suspension cases. As one court put it, this exception is "directed to unusual, *emergency*, situations." *Air North America*, 937 F.2d at 1437 (collecting cases, emphasis added).  It is apparent that there was no such emergency in this case, as EPA did not move for preliminary injunctive relief or suspension, as it can in situations where its administrative or other judicial enforcement remedies, including an SSURO, would be inadequate in restraining the violation or at preventing an unreasonable risk to human health or the environment. *See* 7 U.S.C. § 136n(c); EPA's FIFRA Enforcement Response Policy (Dec. 3, 2009), at 9 (available at http://cfpub.epa.gov/compliance/resources/policies/civil/fifra/).     Further, EPA has been specifically aware of the presence of Impurity X for nearly 20 years and has repeatedly approved CFSs that did not identify it.  Given the foregoing, the Court should conclude that section 558(c)'s "public interest" exception, if invoked by EPA, is inapplicable.

compliance with all lawful requirements.   Instead, with its SSURO effectively terminating AMVAC's licenses for its registered PCNB products, EPA instituted agency proceedings against AMVAC without any prior written notice and any opportunity to demonstrate compliance.

Given the foregoing, the SSURO must be set aside because EPA failed to give AMVAC the notice and opportunity to demonstrate or achieve compliance required by 5 U.S.C. § 558(c). *See, e.g., Anchustegui v. Dep't of Agric.*, 257 F.3d 1124, 1129 (9th Cir. 2001) (agency's cancellation of grazing permit reversed when agency failed to provide the permittee with an opportunity to achieve compliance or to demonstrate that compliance had be achieved before the agency instituted the proceeding to cancel the permit); *Blackwell*, 454 F.2d at 933-936 (approved status of school for attendance by nonimmigrant aliens constituted license; notice and hearing under section 558(c) necessary prior to revocation of status); *See Capital Produce Co., Inc. v. United States*, 930 F.2d 1077, 1079, 1081 (4th Cir. 1991) (holding that failure to provide prior written warning that conduct was deficient and an opportunity to correct deficiencies required that license suspension must be set aside); *The Pillsbury Co. v. United States*, 18 F. Supp. 2d 1034 (Ct. Int'l Trade 1998) (Custom Service violated 558(c) in revoking plaintiff's license to use Exporter's Summary Procedure and blanket waiver; obligation established by APA required Customs to notify the exporter of the reason for revoking license and to provide exporter with opportunity to address that reason).

The rights recognized by Section 558(c) of the APA reflect constitutional due process protections.   As the holder of government-issued licenses for its registered PCNB products, AMVAC has a property right to produce and market those products. *See, e.g., Barry v. Barchi*, 443 U.S. 55 (1979) (suspension of horse trainer's license without pre-deprivation hearing unconstitutional because neither rule nor practice applied to trainer assured timely post-

deprivation hearing); *Industrial Safety Equip. Ass'n, Inc. v. EPA*, 837 F.2d 1115, 1122 (D.C. Cir. 1988) ("There is no question that appellants possess cognizable property interests in their respirator certifications."); *Richardson v. Town of Eastover*, 922 F.2d 1152, 1156 (4th Cir. 1991) (license issued by state which can be suspended or revoked only upon a showing of cause creates a property interest protected by the Fourteenth Amendment).  This property right is protected by the Due Process Clause of the Fifth Amendment to the Untied States Constitution, which guarantees that it cannot be modified, suspended, revoked or withdrawn without the opportunity to be heard at a meaningful time and in a meaningful manner.  *See, e.g., Mathews v. Eldridge*, 424 U.S. 319 (1976); *Bell v. Burson*, 402 U.S. 535 (1971).

"The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'"  *Eldridge*, 424 U.S. at 348 (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171-172 (1951) (Frankfurter, J., concurring)).  The Supreme Court has established that "before a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, 'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'"  *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 570 n.7 (1972) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)).  Even where the government's interests justify immediate action, a full hearing must be available promptly after the temporary deprivation occurs.  *See Goldberg v. Kelly*, 397 U.S. 254, 266-267 (1970). "To be meaningful, an opportunity for a full hearing and determination must be afforded at least at a time when the potentially irreparable and substantial harm caused by a suspension can still be avoided -*i.e.*, either before or immediately after suspension." *Barchi*, 443 U.S. at 74 (Brennan, J., concurring in part).

The determination of what process is due before a deprivation of a right occurs, including whether a post-deprivation hearing is adequate, requires consideration of the now-familiar *Mathews v. Eldridge* factors: (1) the nature of the private interest affected by the government's action, (2) the government's interest, including the fiscal and administrative burdens that would be placed on it by additional procedures, and (3) the risk of erroneous deprivation of the private interest through the procedure used and the value of additional safeguards. *See Eldridge*, 424 U.S. at 335.

The private interest affected by the decision here are AMVAC's licenses for its registered PCNB products. Unlike the social security recipients in *Eldridge* who could be made whole by retroactive payments if their claims were sustained in a post-deprivation hearing, there may be circumstances where "a licensee is not made entirely whole if his suspension or revocation is later vacated." *Dixon v. Love*, 431 U.S. 105, 113 (1977). AMVAC's licenses for its registered PCNB products are important to AMVAC and its employees for their economic well-being and reputational interests. Perhaps that interest is not as "vital and essential" as social insurance payments that are relied on for subsistence, *see Goldberg*, 397 U.S. at 264, but it is nonetheless substantial. Moreover, even a temporary deprivation most likely could not be completely remedied. *See Dixon*, 431 U.S. at 113; Exhibit 5 at ¶ 5; Exhibit 3 at ¶ 4; Exhibit 8 at ¶ 7.

While EPA may have considerable interest in ensuring safety and appropriate procedures with respect to pesticide products under FIFRA, and promptness in responding to such safety concerns can be very important, the agency has made no findings in connection with the SSURO that its immediate action of effectively nullifying AMVAC's licenses was necessitated by the facts presented. *See generally* Exhibit 1. EPA has had ample opportunity prior to issuing the

SSURO to afford AMVAC proper notice and opportunity to comment, with minimal fiscal or administrative burdens.

As to the third factor of the *Eldridge* inquiry, there exists substantial risk of erroneous deprivation in the suspension of AMVAC's licenses prior to a hearing.  Unlike the situation in *Dixon v. Love*, where the state suspended motor vehicle licenses based on "largely automatic" criteria, 431 U.S. at 113, here EPA either has no basis for issuing the SSURO or has affirmatively concealed from AMVAC whatever basis it claims.  There has been no showing that the "record" - if any even exists - that EPA created and upon which it concluded an immediate destruction of this business was necessary had sufficient indicia of reliability or supported a finding of a FIFRA violation that might justify the SSURO.

Additionally, the EPA has provided no standard, nor does AMVAC believe any standard exists, that informs the regulated community whether Impurity X, as it exists in PCNB products, is of "toxicological significance," such that it must be included in a CSF for the product.  Under EPA's regulations, a registrant is required to submit information concerning an impurity as part of its composition statement when it "is determined by EPA to be toxicologically significant." 40 C.F.R. § 158.320(c).  At a minimum, if the EPA intends to sanction AMVAC for allegedly violating FIFRA because EPA has determined that Impurity X is of "toxicological significance" and was required to be included in the product's CSF, then EPA was obligated to first provide AMVAC fair warning of what was required and to make the requisite determination of "toxicological significance" before imposing the sanction.  EPA has acknowledged that it should complete those prerequisite steps before issuing SSUROs. *See* EPA's FIFRA Inspection Manual, at 10-2 (identifying the special considerations and process for issuing a SSURO).[10]  Moreover

---

[10]     The FIFRA Inspection Manual is available at:

EPA has made "toxicological significance" findings for other impurities, thus recognizing that it is necessary to put the regulated community on notice of what is required and to "[s]et a clear standard that can be readily applied by EPA/States and the regulated industry alike." *See* Pesticide Regulation (PR) Notice 96-8 at 2.[11]   Here, EPA never made a determination of "toxicological significance" either as part of its review of the PCNB CSFs or on a generic basis. In the absence of such a determination, there was no way AMVAC could have reasonably anticipated EPA's present position that the CSF does not meet FIFRA requirements.   AMVAC only learned of that position when EPA summarily issued the SSURO and ordered the destruction of AMVAC's PCNB business.

"Traditional concepts of due process incorporated into administrative law preclude an agency from penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule." *Satellite Broadcasting Co., Inc. v. Federal Communications Comm'n*, 824 F.2d 1, 3 (D.C. Cir. 1987).[12]   "The due process clause thus prevents deference [to the agency's interpretation of its regulations] from validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires." *General Electric Co. v. EPA*,

---

http://www.epa.gov/oecaerth/resources/publications/monitoring/fifra/manuals/fifra/index.html

[11]   PR 96-8 is available at: http://www.epa.gov/PR_Notices/.

[12]   In *Satellite Broadcasting Co., Inc. v. Federal Communications Comm'n*, the FCC dismissed Satellite's application for a microwave radio station because it was filed in Washington, D.C., not in Gettysburg, Pa., as the FCC determined the regulations required.  But the specific regulation governing the appropriate location to file, and other regulations, offered "baffling and inconsistent" advice. *Id.* at 2.  Assuming "arguendo" that the FCC's interpretation was reasonable, the court ruled that the FCC should not have dismissed Satellite's application: "[T]he Commission through its regulatory power cannot, in effect, punish a member of the regulated class *for reasonably interpreting Commission rules* .... The agency's interpretation is entitled to deference, but if it wishes to use that interpretation to cut off a party's right, it must give full notice of its interpretation." *Id.* at 4 (emphasis added).

53 F.3d 1324, 1328 (D.C. Cir. 1995) (indications of quotation omitted). EPA's SSURO, if implemented, will violate this most elementary principle of due process.

The D.C. Circuit's decision in *General Electric Co.,* provides a useful illustration of the application of the legal principles implicated by EPA's SSURO in this case. In *General Electric Co.*, EPA fined General Electric for distilling used solvents and incinerating only the contaminated portion instead of immediately incinerating the entire solution. *Id.* at 1326-27. General Electric argued that the regulation at issue did not provide it with reasonable notice of EPA's expectation that it immediately incinerate the entire solution. The relevant inquiry, the D.C. Circuit explained, was:

> whether the regulated party received, or should have received, notice of the agency's interpretation in the most obvious way of all: by reading the regulations. If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation.

*Id.* at 1329. The D.C. Circuit held that the regulation could be interpreted in the manner suggested by EPA, but nevertheless held that EPA could not fine General Electric for its failure to comply with an interpretation that was "so far from a reasonable person's understanding of the regulations that [the regulations] could not have fairly informed GE of the agency's perspective." *Id.* at 1330; *see also United States v. Chrysler Corporation*, 158 F.3d 1350, 1354-57 (D.C. Cir. 1998) (holding that agency failed to provide fair notice of specific requirements of compliance testing and government therefore could not seek an automobile recall on the ground that Chrysler had failed to properly to perform testing); *Rollins Envtl. Svcs. (NJ) Inc. v. EPA*, 937 F.2d 649, 653 (D.C. Cir. 1991) (rescinding fine assessed by EPA because regulation was ambiguous). In other words, the court in *General Electric* refused to permit an agency to sanction a company

based on the failure of the company to comply with an expectation held by the agency but not shared with the regulated public. Here, as in *General Electric*, EPA's FIFRA regulations failed to provide AMVAC with constitutionally adequate notice of the expectations that provide the basis for the sanction EPA has imposed by the SSURO issued in this case.

Historically, when EPA has had a concern about the accuracy of a CSF, the agency has had meaningful, substantive meetings with the registrant to discuss and address those concerns. *See* Declaration of Fred Smith, attached hereto as Exhibit 7, at ¶ 7. No such meetings occurred here. AMVAC told the agency about Impurity X back in 1993. Exhibit 2 at ¶ 5. EPA, on two subsequent occasions, approved two CSFs for the product. Exhibit 4 at ¶¶ 5-7. In January 2010, AMVAC again brought the issue to EPA's attention. The agency acknowledged being aware of it since 1993 and, rather than attempting to resolve the issue at AMVAC's request, instead issued the SSURO, knowing full well what its impact would be.

In sum, there were no exceptional circumstances present that justify EPA's sudden and 11th-hour nullification of AMVAC's license and eradication of a multi-million dollar business, without any pre-deprivation notice or opportunity to be heard. The "procedures" offered to AMVAC by EPA in this case – none - were not adequate to satisfy the most basic requirements of procedural due process. Accordingly, the Court should conclude that EPA's actions deprived AMVAC of procedural due process as a matter of law.

### C.      The Balance Of The Interests Favors AMVAC.

As noted in Part I, AMVAC's interests in this matter are extremely high. The potential irrecoverable loss of business, customers and goodwill poses a grave risk to AMVAC absent injunctive relief.

By contrast, EPA will not be harmed whatsoever by a temporary and preliminary injunction. EPA's enforcement structure under FIFRA remains intact. The injunction would

merely require EPA to:  (1) provide the constitutional minimum in terms of due process before revoking AMVAC's FIFRA registration, which has been approved and in place since 1985; and (2) make its decisions regarding enforcement in a reasoned matter based on substantial evidence. Therefore, this factor favors granting the AMVAC's motion for preliminary injunctive relief.[13]

### D.    The Public Interest Will Not Be Harmed.

EPA cannot allege in good faith that the enforcement of this SSURO is a matter of grave public importance.  EPA has made no finding, or even an allegation in the SSURO, that there is *any* public health or environmental concern from the fact that the CSF does not list Impurity X. The allegation is only that the CSF does not include a trace impurity that EPA has never even determined is of toxicological significance, a finding that must be made before a violation can even be alleged, let alone an order to destroy the product issued.

Moreover, prohibiting the use of this product could cause even greater environmental damage.  When snow mold damage occurs and becomes visible in the spring the impact can be severe.  Repairing and remediating the turf could require the use of a variety of products, including but not limited to new grass seed, new and additional fertilizer, new and additional treatments with fungicide, the use of seeding equipment, and the use of higher quantities or different types of insecticide and herbicide to counteract collateral damage.  Exhibit 5 at ¶ 3.  If the damage is significant enough, repair and remediation may not be an option, and the only solution could be the use of new sod.  *Id.*

EPA has any number of tools it can use to ensure the safe use of pesticides under FIFRA (which is not even the issue here).  Chief among these is the power to suspend or cancel

---

[13]    In contrast to the millions in damages that AMVAC will certainly face should EPA enforce the SSURO, EPA will incur no costs or damages if it is enjoined from enforcing the SSURO.  Consequently, this Court should waive the required posting of a security pursuant to Fed. R. Civ. P. 65(c).

registration under 7 U.S.C. § 136d.  In both of these instances, the registrant is afforded the opportunity to contest the suspension or cancellation at a hearing.  If EPA is concerned that PCNB products are deleterious to health and the environment, it could institute proceedings to suspend or cancel the registration of PCNB.  Indeed, EPA could have chosen this path instead of issuing the SSURO and provided AMVAC with some semblance of process as required by FIFRA and its regulations.  Here, AMVAC has had no process, and it is unlawful to issue and enforce this destructive and arbitrary order without notice and an opportunity to be heard.

Moreover, the SSURO does not allege that Technical Grade PCNB poses a threat to human health or the environment.  Rather, the basis for the order is limited to a single paperwork issue: alleged differences between the formula for PCNB as stated in the CSF and the formula for PCNB as implemented by AMVAC in its products.  The public doubtlessly has an interest in ensuring that CSFs are complete, but it is self-evidently not as high where even the agency has not alleged any specific harm to the public.  Resolution of these allegations after imposition of appropriate injunctive relief, therefore, will not harm the public interest.

## IV.   CONCLUSION

Based on the foregoing, a temporary restraining order and preliminary injunction is necessary to prevent irreparable harm to AMVAC's business operations.  Because AMVAC is likely to succeed on the merits, and because the balance of interests between AMVAC, EPA and the public favors AMVAC, this court should grant the motion and issue the requested injunctive relief.

Respectfully Submitted,

K&L GATES LLP

_Barry M. Hart_

Barry M. Hartman (D.C. Bar #291617)
Christopher R. Tate (D.C. Bar #989033)
Christopher Nestor*
Thomas R. Carey**

1601 K Street, N.W.
Washington, D.C.  20006-1600
Phone: 202.778.9000

17 North Second Street, 18th Floor*
Harrisburg, PA 17101-1507
Phone: 717.231.4500

70 W. Madison St., 3100**
Chicago, IL 60602
Phone: 312.372.1121

barry.hartman@klgates.com
christopher.tate@klgates.com
christopher.nestor@klgates.com
thomas.carey@klgates.com

# EXHIBIT 1

 **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

AUG 1 2 2010

OFFICE OF
ENFORCEMENT AND
COMPLIANCE ASSURANCE

## CERTIFIED MAIL RECEIPT RETURN REQUESTED
## ELECTRONIC TRANSMISSION

Mr. Eric Wintemute
President and Chief Executive Officer
American Vanguard Corporation
4695 MacArthur Court, Suite 1250
Newport Beach, CA 92660

> *Re*:   STOP SALE, USE OR REMOVAL ORDER
> AMVAC and AMVAC Chemical Corporation

Dear Mr. Wintemute:

Enclosed is a Stop Sale, Use, or Removal Order (Order) from the United States Environmental Protection Agency (EPA) concerning American Vanguard Corporation's (AMVAC's) registered pesticide products containing pentachloronitrobenzene (PCNB).  The Order pertains to, but is not limited to, AMVAC's registered pesticide, Technical Grade PCNB 95% (EPA Registration Number 5481-197).

The Order shall extend to all PCNB-containing pesticide products derived from the technical grade pesticide or from the same source of PCNB active ingredient, directly or indirectly, under AMVAC's ownership, control, or custody, wherever the products are located. This Order extends to any pesticide products with alternate brand names, products distributed under supplemental registrations, and products distributed or sold subject to the provisions of FIFRA Sections 18 and 24(c).

EPA has reason to believe, based on information provided by AMVAC and on tests performed by EPA on samples of PCNB product provided by AMVAC, that this pesticide and any other products derived from this pesticide may contain impurities of toxicological significance.  In particular, the pesticide, Technical Grade PCNB 95% (EPA Registration Number 5481-197) does not adequately express the composition of the product as required by FIFRA Section 3 and 40 Code of Federal Regulations (CFR) § 158.320 of its implementing regulations.

This Order extends to all quantities and sizes of this potentially violative pesticide and to any other product, including technical grade, manufacturing use pesticides, and any end-use pesticides, directly or indirectly derived from this product. ***The Order is effective immediately upon receipt.***

Section 13(a) of FIFRA, 7 U.S.C. § 136k(a), authorizes the Administrator of EPA to issue an order prohibiting the sale, use, or removal of any pesticide by any person who owns, controls, or has custody of such pesticide whenever there is reason to believe the pesticide is in violation of any provision of FIFRA or has been or is intended to be distributed or sold in violation of any provision of FIFRA. EPA has reason to believe AMVAC and AMVAC Chemical Corporation have distributed and sold, and intend to continue to distribute and sell violative pesticide products.

Please submit a written proposal for proper disposition and inventory of the products subject to this Order within 10 days of receipt of this Order. If you have any questions about this matter or wish to request an informal conference to discuss these alleged violations, you may contact Yvette P. Hellyer, Enforcement Case Officer, Pesticides and Tanks Enforcement Branch, Waste and Chemical Enforcement Division, at USEPA Headquarters, 1200 Pennsylvania Avenue (2249A), Washington, DC 20460, or by telephone at (202) 564-4033. For any legal matters concerning this Order, please contact Thomas Charlton, Attorney, at the same address, or by telephone at (202) 564-6960.

Sincerely,

Rosemarie A. Kelley, Director
Waste and Chemical Enforcement Division

cc: Mr. Jon C. Wood,
        AMVAC Director of Regulations

Enclosure

2

## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
## HEADQUARTERS

*In the Matter of:*                              )
                                                 )          **STOP SALE, USE OR**
**American Vanguard Corporation (AMVAC)**        )            **REMOVAL ORDER**
  **4695 MacArthur Court, Suite 1250**         )
**Newport Beach, CA 92660**                      )      **Docket No. FIFRA-HQ-2010-5021**
                                                 )
    **Respondents...**            )
_____  )

### I. AUTHORITIES

1. Section 13(a) of the Federal Insecticide, Fungicide and Rodenticide Act, as amended,
   (FIFRA), 7 U.S.C. § 136k(a), authorizes the Administrator of the United States
   Environmental Protection Agency (USEPA or EPA) to issue an order prohibiting the
   sale, use, or removal of any pesticide or device by any person who owns, controls, or has
   custody of such pesticide or device whenever there is reason to believe, *inter alia*, the
   pesticide or device is in violation of FIFRA, or the pesticide or device has been or is
   intended to be distributed or sold in violation of FIFRA.

2. This authority has been delegated from the EPA Administrator to the Director of the
   Waste and Chemical Enforcement Division, Office of Civil Enforcement, Office of
   Enforcement and Compliance Assurance, EPA.

3. Section 12(a)(1)(C) of FIFRA, 7 U.S.C. § 136j(a)(1)(C), states it shall be unlawful for
   any person in any state to distribute or sell to any person any registered pesticide the
   composition of which differs at the time of its distribution or sale from its composition as
   described in the statements required in connection with their registration under Section 3
   of FIFRA.

4. Section 12(a)(2)(I) of FIFRA, 7 U.S.C. § 136j(a)(2)(I), states it shall be unlawful for any
   person to violate any order issued under Section 13 of FIFRA.

5. Section 2(s) of FIFRA, 7 U.S.C. § 136(s), defines a "person" as any individual,
   partnership, association, corporation, or any organized group of person whether
   incorporated or not.

6. Section 2(gg) of FIFRA, 7 U.S.C. § 136(gg), defines "to distribute or sell" as to
   distribute, sell, offer for sale, hold for distribution, hold for sale, hold for shipment, ship,

deliver for shipment, release for shipment, or receive and (having so received) deliver or offer to deliver.

7. Section 2(u) of FIFRA, 7 U.S.C. § 136(u), defines a "pesticide" as any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest. *See also* 40 Code of Federal Register (CFR) § 152.15.

8. 40 CFR § 158.300 defines "impurity" as any substance (or group of structurally similar substances if specified by the Agency), in a pesticide product other than an active ingredient or an inert ingredient, including unreacted starting materials, side reaction products, contaminants, and degradation products.

9. 40 CFR § 158.300 defines "impurity associated with an active ingredient" as (1) any impurity present in the technical grade of active ingredient; and (2) any impurity which forms in the pesticide product through reactions between the active ingredient and any other component of the product or packaging of the product.

10. American Vanguard Corporation (AMVAC), located in Newport Beach, California, is the parent corporation of AMVAC Chemical Corporation. It is a "person" within the definition of FIFRA.

11. AMVAC Chemical Corporation, located at 4100 East Washington Boulevard, Los Angeles, California, 90023, is an operating subsidiary of AMVAC and is a "person" within the definition of FIFRA.

12. AMVAC Chemical Corporation is the registrant of record for the EPA company number "5481" and is a "person" within the definition of FIFRA.

13. This Order refers to AMVAC, AMVAC Chemical Corporation, and all their divisions, offices, branches, subsidiaries, and affiliates collectively as the "Respondents."

## II. BACKGROUND AND BASIS FOR ORDER

14. AMVAC is the registrant for the pesticide product, Technical Grade PCNB 95% with EPA Registration Number 5481-197. The active ingredient is pentachloronitrobenzene, with CAS Number 82-68-8.

15. On January 4, 2010, AMVAC submitted samples of its pesticide product, Technical Grade PCNB 95% (EPA Reg. No. 5481-197), to the USEPA Environmental Chemistry Laboratory located at Stennis Space Center in Mississippi.

16. Analytical results dated January 21, 2010, for the January 4, 2010 samples confirmed the presence of Impurity X, a substance or class of substances known to be of toxicological significance. (Note: Impurity X information is protected by FIFRA confidential business information.)

17. On January 29, 2010, AMVAC submitted test data to the USEPA Office of Pesticide Programs documenting the presence of Impurity X, a substance or class of substances known to be of toxicological significance, in its pesticide product, Technical Grade PCNB 95% (EPA Reg. No. 5481-197).

18. The Confidential Statement Formula (CSF) for Technical Grade PCNB 95% (EPA Reg. No. 5481-197), submitted by AMVAC on January 10, 2005, did not identify the presence of Impurity X in the product and therefore did not adequately express the composition of the product as required by Section 3 of FIFRA and 40 CFR § 158.320 of its implementing regulations.

19. EPA has reason to believe the CSF submitted by AMVAC to EPA for Technical Grade PCNB 95% (EPA Reg. No. 5481-197) is not an accurate representation of the product's current contents.

20. Any distribution or sale of any registered pesticide product for which the CSF does not accurately reflect the composition of the product is a violation of FIFRA Section 12(a)(1)(C), 7 U.S.C. 136 § 136j(a)(1)(C). In accordance with 40 CFR § 158.320, the information required to accompany the application, including information on toxicologically significant impurities of the product, must be provided.

21. Under FIFRA and its implementing regulations, neither a change of manufacturing process or formula may be done as a notification under 40 CFR § 152.46, but must instead be done by submission of an amendment request. No product can be distributed or sold under the new process or composition, unless the Agency approves the amendment request.

22. Based on the presence of Impurity X in Technical Grade PCNB 95% (EPA Reg. No. 5481-197), EPA has reason to believe the CSF does not accurately reflect the composition of the product, Technical Grade PCNB 95% (EPA Reg. No. 5481-197) and any pesticide product formulated, or directly or indirectly derived from, or from the same source of PCNB active ingredient. Furthermore, EPA believes AMVAC has been selling

3

and distributing pesticides for which the composition differs in violation of Section 12(a)(1)(C) of FIFRA, 7 U.S.C. § 136j(a)(1)(C).

## III. ORDER

23. The Respondents are hereby ordered to **immediately** cease the distribution, sale, or use of Technical Grade PCNB 95% (EPA Reg. No. 5481-197) and any PCNB-containing pesticide products derived from the technical grade pesticide or from the same source of PCNB active ingredient (collectively, the "violative pesticide products") which are in the ownership, control, or custody of the Respondents, wherever the violative pesticide products are located.

24. This Order shall extend to all violative pesticide products with alternate brand names, products distributed under supplemental registrations, and products distributed or sold subject to provisions of FIFRA Sections 18 or 24(c).

25. This Order applies to all quantities and sizes of violative pesticide products intended for sale or distribution in the domestic market.

26. The violative pesticide products shall not be used, sold, offered for sale, held for sale, shipped, delivered for shipment, received, or having been so received, shall not be delivered, offered for delivery, moved, or removed for disposal from any facility or establishment of the Respondents, for any reason, other than in accordance with the provisions of this Order or such further Orders as may be issued by EPA in connection with the violative pesticide products.

27. Within 10 days of receipt of the Order, Respondents must submit a written proposal for proper disposition of all violative pesticide products subject to this Order. The proposal shall include an inventory of detailed accounting of each product by EPA Registration Number (if applicable), brand name(s), unit packaging size(s), quantity, and locations(s) products are being held. The proposal and inventory shall be submitted to the following person, or to such other person as EPA designates in writing:

> *Attn:* Mr. Thomas Charlton, Attorney/Advisor
> US Environmental Protection Agency
> Office of Enforcement and Compliance Assurance (2249A)
> 1200 Pennsylvania Avenue, NW
> Room 5041
> Washington, DC 20460-0001.

4

28. Respondents may remove or may ship, for purposes of consolidation and/or disposal, the violative pesticide products in compliance with federal, state, and local laws and regulations for such disposal, provided EPA approves in writing that such disposal can occur. Any such movement of product subject to this Order shall be documented and reported to EPA by identifying EPA Registration Number, brand name, quantities, locations, and ultimate disposition of the product involved.

29. Respondents must create and maintain an inventory of all stocks of these violative pesticide products. Such inventory must include information on the amount and location of such stocks. Respondent must provide written updates to EPA of the inventory upon request. Updates of the inventory shall be submitted to Mr. Charlton or such other person as EPA designates in writing.

30. Any agent, owner, or operator of the Respondents violating the terms or provisions of this Order may subject the violator to civil or criminal penalties as prescribed in the Section 14 of FIFRA, 7 U.S.C. §136*l*.

31. The issuance of this Order shall not constitute a waiver by EPA of its remedies, either judicial or administrative, under FIFRA or any other Federal environmental law, to address this matter or any other matters or unlawful acts not specified in this Order.

32. This Order shall be EFFECTIVE IMMEDIATELY upon receipt by Respondents.

33. This Order shall remain in effect until after EPA vacates the Order in writing.

### IV. OTHER MATTERS

34. For additional information, contact Yvette P. Hellyer, Enforcement Case Officer, at (202) 564-4033, and for any legal matters, contact Thomas Charlton, Attorney, at (202) 564-6960, in the Pesticides and Tanks Enforcement Branch.

_____         8/12/10
Rosemarie A. Kelley, Director        Date:
Waste and Chemical Enforcement Division
Office of Civil Enforcement

**Docket No. FIFRA-HQ-2010-5021**
**STOP SALE, USE OR REMOVAL ORDER**

# EXHIBIT 2

# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICAN VANGUARD CORPORATION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No.** |
| **v.** ) | |
| ) | |
| **LISA P. JACKSON,** *et al.* ) | |
| ) | |
| **Defendants.** ) | |

## DECLARATION OF IAN CHART

1.      My name is Ian Chart.  I am over eighteen years of age, and I am competent to make this declaration.  The facts herein are of my personal knowledge and are true and correct.  I make this affidavit in support of Plaintiff's Complaint for Declaratory and Injunctive Relief.

2.      I am Vice President and Director of Regulatory Affairs for the AMVAC Chemical Corporation ("AMVAC").  I am also Managing Director of AMVAC Chemical UK, Ltd. Prior to joining AMVAC, I trained in Biomedical Sciences and became a Fellow of the Institute of Biomedical Sciences, taught at what is now the Metropolitan University of Manchester and was one of the national examiners in the UK.  I was a toxicologist at the Central Toxicology Laboratory of ICI/Zeneca for 10 years and then became Toxicology/Senior Regulatory Manager, in the Plant Protection Division covering worldwide regulations for 10 years.  I have worked for AMVAC for approximately 15 years.

3.      My responsibilities include leading AMVAC's efforts to register the company's products before the United States Environmental Protection Agency ("EPA") and other regulatory bodies worldwide, and to oversee our efforts to ensure the products meet all

applicable regulatory requirements, especially those relating to the environment and public health and safety.

4.      In approximately December of 2009, AMVAC became aware of the presence Impurity X in an AMVAC product called "Technical Grade PCNB." Technical Grade PCNB is a registered pesticide product (EPA Registration No. 5481-197) under the Federal Insecticide, Fungicide, & Rodenticide Act ("FIFRA"). The active Ingredient in Technical Grade PCNB is pentachloronitrobenzene or "PCNB." PCNB is a pesticide active ingredient used, in part, to prevent fungus growth on golf course fairways and greens at the end of the golf season.

5.      Before December of 2009, I had no prior knowledge that Technical Grade PCNB contained low level Impurity X as an impurity. Afterwards I learned that a FIFRA Section 6(a)(2) notice concerning small quantities of Impurity X detected in an analysis of AMVAC PCNB was sent from AMVAC to EPA by letter dated July 2, 1993, but to my knowledge EPA never responded to this. The CSF for the Technical Grade PCNB has included other impurities required to be referenced by applicable regulation.

7.      As a result of the discovery of minute amounts of Impurity X in Technical Grade PCNB, in December of 2009 AMVAC contacted the EPA to discuss the issue. EPA was informed that AMVAC had initiated an Impurity X data collection and manufacturing process review for Technical Grade PCNB. Samples of Technical Grade PCNB were sent to an outside laboratory for Impurity X analysis in January of 2010. A copy of the APVMA environmental risk assessment was sent to EPA in February of 2010. Impurity X sample results from the January 2010 Technical Grade PCNB analysis were sent to

EPA in March of 2010 (the turn-a-round time for Impurity X sample analysis is three weeks or more).

9.     An initial teleconference between AMVAC and EPA officials was scheduled in April of 2010.  I participated in this teleconference.  EPA was informed of the FIFRA Section 6(a)(2) notice sent from AMVAC to EPA by letter dated July 2, 1993.  An EPA official named Jill Bloom (EPA Chemical Review Manager) said that EPA was aware of this notification.  The main topic of discussion during this teleconference related to answering EPA questions concerning the PCNB manufacturing process, such as process temperatures and production stages, and where in the process the Impurity X may have been generated.  At no time during this teleconference did EPA state that the levels of Impurity X detected in the March 2010 Technical Grade PCNB posed a toxicological risk – significant or otherwise.  No one from EPA who was on this call ever indicated during this teleconference that the confidential statement of formula ("CSF") supporting the Technical Grade PCNB pesticide registration needed to be amended or that the agency was considering issuing a stop sale, use or removal order ("SSURO") for this product.  The teleconference ended with AMVAC stating that it would be investigating its Technical Grade PCNB manufacturing process to determine how the low level Impurity Xs were being generated (they are not found in the raw materials used to manufacture Technical Grade PCNB) and to investigate solutions to this situation.  The EPA officials appeared to be satisfied with this action plan.

10.     During the next few weeks, AMVAC continued to sample portions of its inventory of Technical Grade PCNB and send the samples to its contract laboratory for analysis.  Sample results revealed minute levels of Impurity X impurities –far less than

the .1% that would trigger any automatic requirement to identify Impurity X on the CSF.

AMVAC's process chemists also continued to investigate where in the Technical Grade

PCNB manufacturing process the low level Impurity Xs were being generated. Points of

such generation were narrowed to two process locations. Any contemplated

modifications to the manufacturing process had to be studied carefully, however, so that

the final product was within specification for all the current components of the CSF. If

AMVAC could not eliminate the Impurity X impurities in their entirety from the product,

the goal would be to reduce the Impurity X impurities to the lowest,

technical/commercially-practicable levels. AMVAC chose this goal not because

Impurity X presented any risk or other significance, but rather because it was an impurity

that was unnecessary to the process or performance of the product.

11.     At AMVAC's request, and as soon as test results could be obtained, a follow-up

meeting to further discuss the PCNB / Impurity X issue was scheduled for on June 3,

2010. The meeting held at EPA's offices.

12.     The purpose of the meeting was to discuss AMVAC's progress in addressing the

low-level Impurity X  situation. EPA was also informed that: (i) AMVAC was the only

registered PCNB manufacturer in North America; (ii) the Technical Grade PCNB

manufacturing process is extremely complex and would require months of downtime if it

was shut down because it was not properly working or if the process had to be changed;

(iii) Technical Grade PCNB inventories had to be kept built up to adequately serve

customers (about 3 million pounds); (iv) the current Technical Grade PCNB inventory

was being sampled for Impurity X on a Lot basis; and (v) the formulation/technical

relationship between PCNB manufacture and Impurity X  formation was actively being

4

investigated. EPA was also informed that based on additional testing, only very, very small quantities of Impurity X impurities are formed in the manufacture of the crude PCNB and that changes to purification stage of the current PCNB manufacturing process were being considered.

13.     At the June 3, 2010 meeting, EPA did not discuss any acceptable or unacceptable levels for Impurity X applicable to Technical Grade PCNB.  The EPA officials appeared satisfied with the steps that AMVAC was taking to address the low level Impurity X issue.  The officials never indicated that Impurity X applicable to Technical Grade PCNB was toxicologically significant.  EPA never stated that it thought that AMVAC was violating FIFRA because it did not include Impurity X in its CSF, or that wanted an amendment to Technical Grade PCNB's CSF,  or that it was  were considering issuing an SSURO with respect to  AMVAC's PCNB product line.

14.     After the June 3, 2010 meeting AMVAC continued to study ways to reduce or eliminate Impurity X impurities from Technical Grade PCNB.  Between the June meeting and our receipt of the SSURO, there were no discussions or communications of which I am aware in which EPA indicated that it was going to issue the SSURO, or that AMVAC was violating FIFRA as alleged in the SSURO.

15.     I was very surprised when EPA officials called me on Friday, August 13, 2010 to inform me that it had written and was issuing a stop-sale order concerning AMVAC's PCNB registered products.

16.     I have been involved in participating in the EPA FIFRA registration process for over 20 years.  AMVAC has dozens of products that are registered, each of which has been accompanied by a CSF.  We have had questions raised about CSFs in the past, after

5

they were approved and the product was in production.  We have always been able to address these with the agency.  We have never been issued an SSURO based on concerns about what is included or not included in a CSF.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2010.

Ian Chart

7

# EXHIBIT 3

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN VANGUARD CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. |
| v. ) | |
| ) | |
| LISA P. JACKSON, *et al.* ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF DAVID JOHNSON

1.     My name is David Johnson. I am over eighteen years of age, and I am competent to make this declaration. The facts herein are of my personal knowledge and are true and correct. I make this affidavit in support of Plaintiff's Complaint for Declaratory and Injunctive Relief.

2.     I am currently the Chief Financial Officer for American Vanguard Corporation ("AMVAC"). I have held this position for two and a half years. I have thirty years' experience in corporate finance. I am a chartered management accountant in the United Kingdom, and I have a degree in business from Coventry University.

3.     I am familiar with the issuance to AMVAC of a Stop Sale, Use or Removal Order ("SSURO") by Defendants. It is my understanding that, if the SSURO remains in effect through this Fall, we will likely be prevented from selling, shipping, and delivering all products containing Technical Grade PCNB 95% ("PCNB Products").

4.     Based on my review of AMVAC's financial statements and projections, I have concluded that, if left in place over the next several months, the SSURO will likely cause millions of dollars in actual damages to the company and that none of that will be recoverable, even if the SSURO

is eventually found to be invalid.  The types of damages would likely include asset write-offs, disposal costs, tax impacts,  and other impacts on our balance sheet .  I or someone under my direction can provide details of these damages, which is confidential business information.

5.      **Impact on Los Angeles Operations**: Manufacturing AMVAC's PCNB Products accounts for 35% of the activity on AMVAC's Los Angeles, California, manufacturing facility. At the Los Angeles site, AMVAC currently employs 111 people (in both manufacturing and management capacities).  Suspending the manufacturing activity might affect the status of many of those employees, and would have an effect on the use and value of the Los Angeles site in general.

6.      **Miscellaneous:** To my knowledge, AMVAC is the world's only producer and supplier of this product.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 24, 2010.

D. T. [signature]
_____
David Johnson

# EXHIBIT 4

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICAN VANGUARD CORPORATION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No.** |
| **v.** ) | |
| ) | |
| **LISA P. JACKSON,** *et al.* ) | |
| ) | |
| **Defendants.** ) | |

## DECLARATION OF JON C. WOOD

1.      My name is Jon C. Wood. I am over eighteen years of age, and I am competent to make this declaration. The facts herein are of my personal knowledge and are true and correct. I make this affidavit in support of Plaintiff's Complaint for Declaratory and Injunctive Relief.

2.      I am the Director of Registrations for the AMVAC Chemical Corporation ("AMVAC"). I have held this position since February of 1998. I received my Bachelors of Science degree in Zoology from California State University, Long Beach, and my Masters of Business Administration degree from California Polytechnic University, Pomona.

3.      I am responsible for the implementation of domestic product registration strategies and ensuring that AMVAC's are in compliance with United States Environmental Protection Agency and state regulations. Prior to joining AMVAC, I was ENTEK Corporation's Registration Manager, and Senior Research Scientist with UNOCAL's Agricultural Chemicals Research Group, where I was employed for 15 years. One of the AMVAC product lines I am responsible for includes "Technical Grade

PCNB." Technical Grade PCNB is a registered pesticide product (EPA Registration No. 5481-197) under the Federal Insecticide, Fungicide, & Rodenticide Act ("FIFRA").

5.      Technical Grade PCNB contains the Active Ingredient ("AI") pentachloronitrobenzene ("PCNB"), with CAS Number 82-68-8. Technical Grade PCNB was originally registered as "Technical Grade PCNB 95%" with an AI label concentration of 95% by weight. In December 1998, a "Confidential Statement of Formula" or "CSF" was prepared by AMVAC and submitted to EPA for review and approval to support an AI concentration change to 96.2%. EPA responded in April 1999, stating that the revised CSF could not be accepted until a revised product label was submitted. The label was revised accordingly and submitted to EPA for review and approval. EPA approved of the revised label in writing in December of 1999.

6.      In 2003, AMVAC sought to revise the Technical Grade PCNB label to reflect the results of a Dermal Sensitization Study. The study and proposed revised label were submitted to EPA. On December 11, 2003, EPA approved the revised label so long as requested edits to it were made. The label was edited accordingly and sent back to EPA on February 2, 2004. AMVAC continued to sell product under the prior label during this time.

7.      On January 10, 2005 AMVAC prepared a second CSF to submit to the Agency. This second CSF was amended to reflect that AMVAC, in addition to being a Technical Grade PCNB manufacturer, would be a supplier of Technical Grade PCNB, as well. The amendment did not change any of the listed chemicals or percent weights of individual ingredients. This second CSF was approved by EPA by letter dated April 21, 2005.

8.      Since December of 1999, the labeled AI concentration of PCNB in Technical Grade PCNB has been listed as 96.2% by weight.  The inert ingredients are labeled at 3.8% by weight.

9.      The CSFs submitted to EPA in 1999 and 2005 do not list Impurity X as ingredients, impurities, or otherwise.  Prior to the issuance of the Stop Sale, Use or Removal Order ("SSURO") dated August 12, 2010, no representative of EPA informed me, nor was I aware of information from any source concluding, that Impurity X purportedly measured in samples of Technical Grade PCNB were at concentrations or levels that constituted "impurities of toxicological significance" a term that exists in the regulations.

10.     As Director of Registrations for AMVAC, I am aware that a "FIFRA Section 6(a)(2) Submittal for [Impurity X] in AMVAC PCNB" was submitted to EPA by letter dated July 2, 1993.  At no time during my employment with AMVAC, including the time periods in which the two CSFs were submitted to EPA in 1999 and 2005, was I informed by EPA that the "FIFRA Section 6(a)(2) Submittal for [Impurity X] in AMVAC PCNB" required that Impurity X be listed as impurities in said CSFs.

11.     EPA never told me before it issued the SSURO that the agency believed AMVAC was violating FIFRA by not including Impurity X on the CSF for Technical Grade PCNB, and EPA never told me or gave me a determination that Impurity X was "toxicologically significant" within the meaning of FIFRA or its enabling regulations.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on August **25**, 2010.

Jon C. Wood

Jon C. Wood

# EXHIBIT 5

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN VANGUARD CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| LISA P. JACKSON, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF JEFFREY ALVIS

1.     My name is Jeffrey Alvis.  I am over eighteen years of age, and I am competent to make

this declaration.  The facts herein are of my personal knowledge and are true and correct.  I make

this affidavit in support of Plaintiff's Complaint for Declaratory and Injunctive Relief.

2.     I am currently employed as a Business Manager with AMVAC Environmental Products.

I have held this position for six years.  Prior to this position, I worked with another agricultural

and chemical products company in a similar capacity.  I have a Bachelor's of Science in

Entomology from Texas Tech University, and twenty years' experience in the agricultural

products field.

3.     In my capacity as Business Manager, I am responsible for the sale and management of

non-crop business units, which includes the non-crop-based sales of PCNB products.  For

purposes of this declaration, when I refer to "PCNB products," I mean Technical Grade PCNB

95% (EPA Registration No. 5481-197) and formulations manufactured from the Technical Grade

PCNB 95%.  Approximately 65 percent of PCNB products sold by AMVAC are applied in a

non-crop context; most commonly, it is used on golf courses and other turf areas to reduce the

incidence of pink and grey snow mold.  Typically, the risk of these molds (and, consequently, the use of PCNB Products) is concentrated anywhere in the United States where there is snowfall accumulation throughout the winter.  While PCNB Products are most commonly applied in combination with other fungicides and agricultural products, it is considered a foundational product for the reduction of snow mold.  When snow mold damage occurs and becomes visible in the spring the impact can be severe.  It could require removal, repair, or replacement of massive amounts of turf, depending upon the extent of damage.  Turf restoration costs may include increased use of fertilizers, the use of fungicides, insecticides and herbicides to counteract collateral damage to the turf, additional seed to repair the turf, rental of turf seeding equipment, application of additional control products to protect the new turf, and potentially new sod.

4.     To be effective, application of PCNB Products typically must occur between October and November.  Therefore, given delivery schedules, approximately 80% of PCNB products are sold in September and early October.  By way of example, in August 2010, my sales team announced "Operation Snow Mold", a sales drive aimed at promoting early orders of PCNB products before the fall application season. This sales pattern has occurred every year that I have been in this position.

5.     It is my understanding that the Stop Sale, Use, or Removal Order issued to AMVAC by Defendants prohibits AMVAC from selling or delivering PCNB Products as of the date of the Order.  This prohibition is currently having, and will continue to have, a substantial harmful effect on our business.  We are receiving orders daily for PCNB Products.  Last week alone we received 12 orders. We are not currently filling these orders and will not be able to do so at all if the Order remains in effect.

6.      Based on past sales, 10 % of our product was delivered in August, and 70% delivered in September.  Based on current orders coming in the same pattern should hold.  If this matter is not resolved by the end of August, we stand to lose all of our planned 2010 early order business based on current orders.  Moreover, this business may be lost forever because a late application of PCNB Products is ineffective at preventing snow mold.

7.      Additionally, AMVAC does not currently offer any product that could be acceptably substituted off-the-shelf for PCNB Products.  As a result, the immediate impact of the Order is to create a shortage of effective fungicides in the non-crop market, which could result in substantial damage to the property of our customers.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 24 2010.

Jeffrey Alvis

- 3 -

# EXHIBIT 6

**From:** Avalos, Robert [mailto:RAvalos@nmda.nmsu.edu]
**Sent:** Thursday, August 19, 2010 1:05 PM
**To:** Baumgartner, Carol
**Subject:** NM Product cancellation

Good afternoon Carol,

Due to the stop-sale/ removal order issued by the EPA, the State of New Mexico has cancelled the following registered products.


5481-8981 Terraclor 75W Wettable Powder

5481-8988 Turfcide 10% Granular

5481-8991 Terraclor Flowable Fungicide

5481-8992 Terraclor 400

5481-211 PCNB 10% Granules Soil Fungicide

5481-279 PCNB 75% Wettable Powder

5481-472 Par-Flo


Thank you



**Robert Avalos**

**Registration Specialist**

New Mexico Department of Agriculture
P.O. Box 30005 / MSC 3AQ
3190 South Espina
Las Cruces, NM 88003-8005

# EXHIBIT 7

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **AMERICAN VANGUARD CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.** |
| **v.** | ) | |
| | ) | |
| **LISA P. JACKSON,** *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |

## DECLARATION OF FRED SMITH

1.      My name is Frederick T. Smith.  I am over eighteen years of age, and I am competent to make this declaration.  The facts herein are of my personal knowledge and are true and correct.  I make this affidavit in support of Plaintiff's Complaint for Declaratory and Injunctive Relief.

2.      I am currently employed as a Senior Regulatory Specialist.  I have a Bachelor's of Science degree in Biology from the University of Maryland and over twenty-three years of experience in the regulation and testing of agricultural products.

3.      I have been involved in assisting companies in the pesticide registration process under the Federal Insecticide, Fungicide, & Rodenticide Act for over twenty-one years.  One of my responsibilities is to assist them in filing Confidential Statements of Formula ("CSFs"), which must be reviewed and approved by the United States Environmental Protection Agency ("EPA") before a pesticide is registered.  I have also been involved in assisting companies when questions arise regarding CSFs previously-approved by EPA.  Over the years I have been involved in hundreds of CSF-related matters.

4.      As a general matter, CSFs are supposed to include both active and inactive ingredients (which includes impurities).  Under the EPA regulations, CSFs must, in certain circumstances, also include any impurities, which in laymen's terms are substances that are not added to the formula but rather are created unintentionally in the manufacturing process.  Sometimes this happens as a result of chemical reactions, sometimes as a result of chemical degradation, and sometimes as a result of left-over starting materials.  It is my understanding that under the EPA regulations, these impurities must be included in the CSF if they are present in amounts greater than or equal to 0.1% by weight, or if it is determined that they are of "toxicological significance."

5.      I am not aware of any specific definition of the term "toxicological significance."  EPA typically handles that determination on a case-by-case basis.  Based on my experience, in most cases, the initial judgment on toxicological significance is made by the registrants when they discover an impurity through analytical testing.  Analytical test results are required to be submitted to EPA to support the registration of certain pesticide products.  If EPA feels that impurities present in the formulation, but not included on the CSF, are of toxicological significance, EPA would typically review and discuss the situation with the registrant to resolve the situation, rather than unilaterally issuing a Stop Sale, Use or Removal Order.

6.      I have experienced situations in which analytical testing of pesticide products has identified the presence of impurities that could potentially be considered toxicologically significant (*e.g.,* lead, arsenic, cadmium, mercury, etc.).  The full test results have been reported to the EPA; however, these impurities were not included on the CSF because they were present at levels below 0.1% by weight of the formulation.  Such impurities could clearly be dangerous to human health if the magnitude and duration of exposure to them is sufficiently high.

Nevertheless, by approving the CSF, EPA agreed, in those situations, that the presence of the impurities was not toxicologically significant and did not warrant listing on the CSF.

7.      In the course of my experience, I have made submissions to the EPA relating to CSFs, including situations where impurities are reported and where there are questions about the accuracy or content of the CSF. In every situation in which there was some EPA question about what should or should not go on the CSF, the agency representatives have discussed substantively what their concerns are. I am not aware of a situation where a Stop Sale, Use or Removal order under FIFRA Section 13 was issued before extensive discussions with the agency were completed.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2010.

Frederick T. Smith

# EXHIBIT 8

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN VANGUARD CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. |
| v. ) | |
| ) | |
| LISA P. JACKSON, *et al.* ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF GLEN ANDERSON

1.     My name is Glen Anderson.  I am over eighteen years of age, and I am competent to make this declaration.  The facts herein are of my personal knowledge and are true and correct.  I make this affidavit in support of Plaintiff's Complaint for Declaratory and Injunctive Relief.

2.     I am the Manager of Customer Services for AMVAC Chemical Corporation, a subsidiary of American Vanguard Corporation. I have been in this position for 14 years.

3.     I am responsible for all customer order entry and shipments globally, including orders of PCNB products.  All order entry staff report to me.  Orders arrive via telephone, fax or email from our major distributors.

4.     I am familiar with the issuance to AMVAC of a Stop Sale, Use or Removal Order ("SSURO") by Defendants.  It is my understanding that as long as the SSURO remains in effect, we are not allowed to ship products covered by it in the United States.

5.     After we received the SSURO, I was instructed to hold the covered PCNB shipments until this matter was resolved.  As a result when customers place new orders, we have been

accepting them with the understanding that we would advise them in about two weeks of the status for shipment and confirmation of the Order.

6.      Yesterday I checked our records of open orders for PCNB products, and found that the total outstanding orders were approximately $850,000. When I rechecked today, I found that the amount of open orders was more than $1,100,000. This reflects the fact that our orders are quickly ramping up for the limited Fall sales season.

7.      Yesterday we received a cancellation notice on an order from a major distributor. The Order (with prices redacted) is attached as Exhibit A and the cancellation notice is attached as Exhibit B. I understand that the order was cancelled because the customer heard about the SSURO and did not want the product later in the season when they would miss the market season and be unable to resell the material.

8.      Since there is awareness in the marketplace of this situation, if the SSURO stays in effect even over the next couple of weeks, I fully expect it to adversely affect not only this product, but other AMVAC products as well. The market for this PCNB product is now. Historically this is an in stock item that normally received immediate shipment, which customers have come to expect.

9.        In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the

foregoing is true and correct.

Executed on August 26, 2010.

_____

Glen Anderson

# ATTACHMENT A

**CROP PRODUCTION SERVICES, INC.**
**GREELEY CENTRAL PURCHASING (9300)**
**3005 Rocky Mountain Ave.**
**Loveland, CO 80538**
**970-685-3300**

*Crop*
*Production* (PS)
*Services*

**August 23, 2010**
**14:41:04**
**Jeff McBride**

| | | **Freight Information** | |
|---|---|---|---|
| | **Vendor:** | | |
| **PURCHASE ORDER** | **Cost: $** | 0.00 | |
| | **Code:** | Collect | |

| | | | |
|---|---|---|---|
| **Purch Order #:** | 2373559 | | |
| **Order Date:** | 08/23/10 | | |
| **Delivery Date:** | 08/23/10 | **Direct Ship:** No |
| **Ordered By:** | JEFF McBRIDE | **Cust Order #:** |
| **Release #:** | | **Customer:** |
| **Prod Request #:** | 234790654 | |

### Product Vendor

AMVAC CHEMICAL CORPORATION (4-021888)
2110 DAVIE AVE
COMMERCE, CA 90040-1706

**Terms:**            **Discount:**

### Ship To Location

MALAGA NJ (2512)
945 Rt 47 Sout Delsea Dr
Malaga, NJ 08328

856-694-0120

| Line | Product # | Product Description | EPA#/Lot ID | Quantity | UnitSize | Units | Cost | Extended Cost |
|---|---|---|---|---|---|---|---|---|
| 1 | 7858210 | BLOCKER 10G 50LB | 5481-211 | 6,000.00 LB | 50 LB | 120.00 | ▮ | ▮ |

**Qty Entered:**    6,000.0000 LB

**Total**   ▮

**Comments/Notes:**

'SHIP VIA CONWAY, FEDEX FREIGHT AND BILL TO CPS c/o TRENDSET INC. PO BOX 1208, MAULDIN, SC 29662'

# ATTACHMENT B

**From:** McAllister, Ben
**Sent:** Wednesday, August 25, 2010 6:55 AM
**To:** McBride, Jeff
**Subject:** FW: Purchase Order #2373559
**Importance:** High

We need to just cancel this order. I talked to the rep and he said there is some sort of epa stop sale and they are not sure when they are going to get it straightened out. I don't want them figuring this out in October and sending it then. Thanks

**From:** Patino, Monique [mailto:MoniqueP@amvac-chemical.com]
**Sent:** Tuesday, August 24, 2010 5:45 PM
**To:** McBride, Jeff; Amvac Customer Service Department
**Cc:** McAllister, Ben; Adams, Flossy
**Subject:** RE: Purchase Order #2373559

Your order was received but due to a manufacturing hold we will notify when product will be shipping out.

*Monique Patino (Customer Serv.)*

**AMVAC CHEMICAL**

2110 Davie Ave

Commerce, CA 90040

323-890-1257 Phone

323-728-7394 Fax

**From:** McBride, Jeff [mailto:jeff.mcbride@cpsagu.com]
**Sent:** Monday, August 23, 2010 1:40 PM
**To:** Amvac Customer Service Department
**Cc:** McAllister, Ben; Adams, Flossy
**Subject:** FW: Purchase Order #2373559

.PLEASE CONFIRM RECEIPT OF ORDER AND ADVISE US ON THE ETA

*Jeff McBride*

jeff.mcbride@cpsagu.com

*970-685-3531*

*Fx 303-222-2705*

**From:** jeff.mcbride@cpsagu.com [mailto:jeff.mcbride@cpsagu.com]
**Sent:** Monday, August 23, 2010 2:40 PM
**To:** McBride, Jeff
**Subject:** Purchase Order #2373559

IMPORTANT NOTICE ! This E-Mail transmission and any accompanying attachments may contain confidential information intended only for the use of the individual or entity named above. Any dissemination, distribution, copying or action taken in reliance on the contents of this E-Mail by anyone other than the intended recipient is strictly prohibited and is not intended to, in anyway, waive privilege or confidentiality. If you have received this E-Mail in error please immediately delete it and notify sender at the above E-Mail address. Agrium uses state of the art anti-virus technology on all incoming and outgoing E-Mail. We encourage and promote the use of safe E-Mail management practices and recommend you check this, and all other E-Mail and attachments you receive for the presence of viruses. The sender and Agrium accept no liability for any damage caused by a virus or otherwise by the transmittal of this E-Mail.