IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN VANGUARD CORPORATION )<br><br>Plaintiff, )<br><br>v. )<br><br>LISA P. JACKSON, Administrator, United States )<br>Environmental Protection Agency, and UNITED )<br>STATES ENVIRONMENTAL PROTECTION )<br>AGENCY, )<br><br>Defendants. ) | Case No. 10-cv-01459 (RWR) |

**EPA'S MEMORANDUM IN SUPPORT OF CROSSMOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

/s/ EILEEN T. MCDONOUGH
Environmental Defense Section
U.S. Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
(202) 514-3126
eileen.mcdonough@usdoj.gov

OF COUNSEL:

Michele Knorr
Angela Huskey
Andrea Medici
Office of General Counsel
United States Environmental Protection Agency

TABLE OF CONTENTS

INTRODUCTION …………………………………………………………… 1

BACKGROUND ……………………………………………………………  4

    A.      STATUTORY AND REGULATORY BACKGROUND ……………....  4

    B.      ADMINISTRATIVE BACKGROUND …………………………………  7

    C.      LITIGATION BACKGROUND ………………………………………...  10

STANDARD OF REVIEW …………………………………………………..  11

ARGUMENT …………………………………………………………………  12

I.     AMVAC'S REGISTRATION DOES NOT AUTHORIZE THE SALE OR
      DISTRIBUTION OF PCNB CONTAINING IMPURITY X ………………………  12

    A.     AMVAC Improperly Relies on Extra-record Material ……………………  12

    B.     AMVAC's Claim that EPA Has Approved the Sale and
        Distribution of PCNB Containing Impurity X Is Without Merit …………..  13

II.    THE COURT SHOULD REJECT AMVAC'S ARGUMENT THAT
      EPA MUST PROCEED UNDER FIFRA SECTION 6, RATHER THAN
      SECTION 13(a), TO HALT THE SALE OF PESTICIDE PRODUCTS
      THAT DO NOT COMPLY WITH THE APPLICABLE REGISTRATION ………..  15

    A.     The Stop Sale Order Does Not Affect The Status Of The Registration ……..  15

    B.     FIFRA Allows EPA To Issue The Stop Sale Order Without Initiating
        Proceedings To Cancel Or Suspend AMVAC'S PCNB Registration ………..  16

III.   THE STOP SALE ORDER IS CONSISTENT WITH FIFRA AND
      SUPPORTED BY THE ADMINISTRATIVE RECORD ……………………………  20

IV.   AMVAC'S DUE PROCESS CLAIM IS WITHOUT MERIT ………………………  25

V.    AMVAC'S COMPLAINTS CONCERNING THE ADMINISTRATIVE
      RECORD SHOULD BE DISREGARDED ……………………………………….. 29

CONCLUSION ………………………………………………………………… 29

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN VANGUARD CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 10-cv-01459 (RWR) |
| v. | ) | |
| | ) | |
| LISA P. JACKSON, Administrator, United States | ) | |
| Environmental Protection Agency, and UNITED | ) | |
| STATES ENVIRONMENTAL PROTECTION | ) | |
| AGENCY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**EPA'S MEMORANDUM IN SUPPORT OF CROSSMOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff American Vanguard Corporation ("AMVAC") seeks summary judgment on its

challenge to the order issued by the United States Environmental Protection Agency ("EPA") on

August 12, 2010, that requires AMVAC to "immediately cease the distribution, sale, or use" of

its registered pesticide products containing pentachloronitrobenzene ("PCNB").  Stop Sale, Use

or Removal Order ("Stop Sale Order" or "Order"), ¶ 23, Docket No. FIFRA-HQ-2010-5021

(Aug. 12, 2010) (AR Doc. 31, EPA00509) ( Exhibit 1).  AMVAC previously requested a

temporary restraining order to bar enforcement of the Order, but this Court denied the motion on

September 2, 2010.  (Exhibit 2 (excerpt of hearing transcript containing decision)).

Section 13(a) of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7

U.S.C. § 136k(a), authorizes EPA to issue Stop Sale Order when "there is reason to believe" that

a pesticide will be sold or distributed in violation of FIFRA.  In the Stop Sale Order, EPA

explained in detail why it had "reason to believe" that AMVAC's sales of PCNB would violate

section 12(a)(1)(C) of FIFRA, 7 U.S.C. § 136j(a)(1)(C), which prohibits the sale or distribution

of a registered pesticide if its composition differs from the composition identified by the

registrant in the statements submitted to support the product's registration.  (These statements are

commonly referred to as the "Confidential Statement Formula" or "CSF").  Order, ¶ 18.  *See also*

FIFRA section 3(c)(1)(D), 7 U.S.C. § 136a(c)(1)(D).  Under EPA's regulations, the CSF must

include specific information regarding the components of the pesticide including, where

applicable, information pertaining to "impurities of toxicological significance."  40 C.F.R. §

158.320(c).

As documented in the Order, tests performed by both EPA and AMVAC on samples of

PCNB in January 2010 documented the presence of Impurity X,[1] which EPA identified as "a

substance or class of substances known to be of toxicological significance."  Order, ¶¶ 16-17.

There is no dispute that the CSF submitted by AMVAC did not identify Impurity X in describing

the composition of PCNB.  Therefore, EPA concluded that it had "reason to believe that the CSF

does not accurately reflect the composition of the product," and to believe that the PCNB

products sold by AMVAC were of different composition than identified in the CSF in violation

of FIFRA section 12(a)(1)(C), 7 U.S.C. § 136j(a)(1)(C).  Order, ¶ 22.  Based on this conclusion,

EPA appropriately issued the Stop Sale Order to AMVAC.

---

[1]   Because specific information regarding the composition of PCNB has been characterized by AMVAC as confidential business information ("CBI") under FIFRA, the Stop Sale Order referred to the impurity in question only as "Impurity X."  Order, ¶ 16.  Although EPA does not concede that the information is entitled to treatment as CBI, the Agency will use this same convention here.

In challenging the Stop Sale Order, AMVAC argues that the Order is really a revocation of a license (its FIFRA registration) and that the Order must be vacated because EPA failed to comply with the procedural requirements for cancelling or suspending a registration under FIFRA and the Administrative Procedure Act, 5 U.S.C. § 558(c).   Plaintiff's Brief in Support of Motion for Summary Judgment (Oct. 15, 2010) ("Pltf. Br."). This argument mischaracterizes the Stop Sale Order.  The registration approved by EPA authorized AMVAC to sell PCNB products with a specific composition as identified in the CSF.  The approved registration, including the CSF, does not authorize the sale of PCNB products containing Impurity X.  The Order does not cancel, revoke or modify any of the terms of the registration, but serves only to prevent the sale and distribution of PCNB that would violate section 12 of FIFRA because the products do not match the CSF supporting the registration.  Thus, AMVAC's registration has not been cancelled or suspended, and the procedures for cancelling or suspending a registration simply are not applicable.

AMVAC also contends that EPA's action in issuing the Stop Sale Order was arbitrary and capricious because the Agency did not make a proper determination that Impurity X is toxicologically significant.  In fact, the Agency made that very determination in 1988 in the preamble to the final rule requiring the disclosure of impurities as part of an application for registration.  See *Pesticide Registration Procedures; Pesticide Data Requirements*, 53 Fed. Reg. 15,952, 15,973 (May 4, 1988) (Exhibit 3).  AMVAC raises a host of complaints about the record, but, as explained below, none are legally significant.

AMVAC also challenges EPA's decision to issue the Order on the ground that EPA had purportedly made a previous determination that Impurity X was not toxicologically significant. AMVAC points to the fact that in 1993 it submitted a report stating that Impurity X was present

3

in one batch of PCNB.  According to AMVAC, the fact that EPA subsequently approved

unrelated changes in the CSF without addressing Impurity X must be construed as an affirmative

decision by EPA that there was no need for AMVAC to amend its CSF for PCNB to identify the

presence of Impurity X.  AMVAC's effort to characterize silence as an affirmative determination

must be rejected.  The fact that EPA may have been able to take an enforcement action against

AMVAC in 1993 and did not, does not estop the Agency from taking action today or give

AMVAC the right to continue to sell PCNB in violation of FIFRA section 12.  Testing by both

EPA and AMVAC in 2010 indisputably shows the presence of Impurity X; EPA appropriately

took enforcement action in response to those test results.

Finally, there is no merit to AMVAC's contention that EPA's issuance of the Stop Sale

Order violated the Due Process Clause of the Constitution. As the Court explained in its prior

decision, the Order does not revoke AMVAC's license to sell PCNB that is of the same

composition as identified in the CSF.  Tr. at 54.   Moreover, EPA provided AMVAC the

opportunity to present its position in meetings before and after the Stop Sale Order was issued, as

well as in correspondence after the Order issued.  This process was constitutionally sufficient

under the balancing test established in *Mathews v. Eldridge*, 424 U.S. 319 (1976), given the

actual nature of the dispute at issue:  whether EPA has determined that Impurity X is

toxicologically significant  impurity that AMVAC must disclose on the CSF for PCNB – an

issue resolved by EPA in the 1998 preamble.

## BACKGROUND

## A.    STATUTORY AND REGULATORY BACKGROUND

Under FIFRA, it is generally unlawful to distribute or sell a pesticide product unless it is

"registered," or licensed, by EPA.  EPA registers a pesticide only after conducting a review of

the risks and benefits of that pesticide product to determine whether the use of the pesticide causes "unreasonable adverse effects" to human health or the environment.  "Unreasonable adverse effects" in relevant part means "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb)(1).  The process for registering a pesticide product is set forth in both FIFRA and EPA's regulations, which establish basic application procedures and detailed data submission requirements.  *See* 7 U.S.C. § 136a; 40 C.F.R. Parts 152 and 158.

In relevant part, EPA's regulations require that the applicant must provide information on the composition of the pesticide.  40 C.F.R. § 158.320.  This information must include specific details regarding the active and inert ingredients.  *Id*.  § 158.320(a), (b).  In addition, where the pesticide is produced by an integrated system,[2] the applicant must provide information about two types of impurities that may be associated with the active ingredient.[3]  First, under 40 C.F.R. § 158.320(c), certain information must be provided regarding each toxicologically significant impurity:

> For each impurity associated with the active ingredient that is determined by EPA to be toxicologically significant, the following information is required:
>
> (1) Identification of the ingredient as an impurity.
> (2) The chemical name of the impurity.
> (3) The nominal concentration of the impurity in the product.

---

[2]      AMVAC has not taken issue with EPA's position that PCNB is produced through an integrated system.

[3]      Under 40 C.F.R. § 158.153(e), "[i]mpurity associated with an active ingredient" means:

(1) Any impurity present in the technical grade of active ingredient; and
(2) Any impurity which forms in the pesticide product through reactions between the active ingredient and any other component of the product or packaging of the product.

(4) A certified upper limit, in accordance with § 158.350.[4]

Second, under 40 C.F.R. § 158.320(d), information is required regarding any "other" impurity

present above a specific concentration:

> for each other impurity associated with an active ingredient that was found to be
> present in any sample at a level ≥0.1 percent by weight of the technical grade
> active ingredient the following information is required:
>
> > (1) Identification of the ingredient as an impurity.
> > (2) The chemical name of the impurity.
> > (3) The nominal concentration of the impurity in the final product.

Under FIFRA, the information regarding the composition of the pesticide is critical;

section 12(a)(1)(C) establishes that it is unlawful to sell or distribute "any registered pesticide the

composition of which differs at the time of its distribution or sale from its composition as

described in the statement required in connection with its registration . . . ."  7 U.S.C.

§ 136j(a)(1)(C).  Section 13(a) of FIFRA gives EPA the authority to issue a Stop Sale Order

where "there is reason to believe on the basis of inspections or tests" that a pesticide "has been or

is intended to be distributed or sold in violation of [FIFRA's] provisions."  7 U.S.C. § 136k(a).

Congress did not specify any procedures that EPA must follow before issuing a Stop Sale Order.

Additionally, Congress authorized EPA to cancel or suspend pesticide registrations under

specific conditions.  FIFRA section 6(b) and (c), 7 U.S.C. § 136d(b), (c).  In these provisions,

Congress established detailed procedural requirements to govern EPA's proceedings (including

notice and an opportunity for a hearing).

Finally, in section 16, 7 U.S.C. § 136n, Congress provided for judicial review of EPA's

actions under FIFRA.  Except as otherwise provided, final actions by EPA that are not

---

[4]     EPA's regulations also require submission of additional information concerning the
formation and presence of such impurities.  *See* 40 C.F.R. §§ 158.340, 158.345, and 158.355.

committed to EPA's discretion by law are subject to judicial review in the federal district courts. Because the statute makes no specific provision for the review of Stop Sale Orders, these orders are reviewable in district court.

## B.   ADMINISTRATIVE BACKGROUND

In late 2009, EPA learned about research in Australia indicating the presence of Impurity X in PCNB products").   Email from B. Behl to E. Bennet-Jenkins  APVMA (Feb. 20, 2010) (AR Doc. 13, EPA 00127-28) (Exhibit 4).[5]  EPA employees engaged in discussions with the researchers in Australia and also with employees of the Australian Pesticide and Veterinary Medicines Authority ("APVMA"), which regulates pesticides in that country, regarding the research and a risk assessment prepared by APVMA.  *Id*.  At EPA's request, AMVAC agreed to provide samples of PCNB to EPA for analysis.  Letter from W. Feiler, AMVAC, to J. Ferrario, EPA (Dec. 16, 2009) (AR Doc. 4, EPA 00015-16) (Exhibit 5).  The results of these analyses, which were completed by January 2010, demonstrated that Impurity X was present in AMVAC's PCNB.  Email from J. Ferrario, EPA and attachment (Jan. 22, 2010) (AR Doc. 1, EPA 00001-3) (Exhibit 6).

EPA considered the results of the 2010 testing and the studies prepared by APVMA.  On August 12, 2010, EPA issued the Stop Sale Order.[6]  The Agency explained in the Order that it

_____

[5]      PCNB is referred to in Australia and other countries as "quintozene."

[6]      EPA met and spoke with AMVAC on several occasions between January and June 2010. Email exchange, K. Moran, AMVAC, and J. Bloom, EPA (March 16-24) re conference call between EPA and AMVAC representatives scheduled for March 25, 2010 (AR Doc. 22, EPA 00406-49) (Exhibit 7).  EPA's proposed topics included:  "Why doesn't AMVAC report concentrations of [Impurity X] on its CSFs?".  *Id*. at EPA 00409.  Email exchange, K. Moran, AMVAC, and J. Bloom, EPA (May 19-20, 2010) and attached agenda re meeting scheduled for June 3, 2010.  (AR Doc. 25, EPA 00479-482) (Exhibit 8).  The substance of those discussions is not set forth in the administrative record and the parties disagree as to what statements were or

had reason to believe that the composition of AMVAC's PCNB products currently being

distributed or sold differed from the CSF submitted in support of these pesticide registrations

because the CSF did not identify Impurity X as part of the product's composition.  *Id.* ¶ 18.

Because Impurity X is "a substance or class of substance known to be of toxicological

significance, *id.* ¶¶ 16-17, Impurity X was required to be listed on the CSF.  Since it was not, any

sale or distribution of PCNB by AMVAC would violate FIFRA section 12(a)(1)(C), 7 U.S.C. §

136j(a)(1)(C).  Order ¶ 22.  To prevent further violations of section 12(a)(1)(C), EPA ordered

AMVAC to "immediately cease the distribution, sale, or use of" PCNB products that are in

AMVAC's "ownership, custody or control."  *Id.* ¶ 23.

        In response to the Stop Sale Order, AMVAC's counsel sent EPA written objections to the

Order.  Letter from L. Campbell and T. Backstrom, Bergeson & Campbell, P.C., to R. Kelley,

Director, Waste and Chemical Enforcement Division, EPA (Aug. 18, 2010) ("AMVAC Letter").

Exhibit 9.[7]  In its objection, AMVAC asserted that it notified EPA in 1993 that Impurity X was

present in PCNB and that EPA had approved two subsequent CSF revisions that did not address

Impurity X.  AMVAC, however, did not provide any information to show that EPA's statement

---

were not made.  Under these circumstances, EPA believes that accounts of the meetings will not
facilitate resolution of the cross-motions for summary judgment.

[7]        Neither Exhibit 9 nor the response, Exhibit 10, were relied on by EPA in making the
decision to issue the Stop Sale Order.  These Letters are not cited to support the Agency's action,
however, but to respond to AMVAC's due process claim.   In deciding a claim that an agency has
violated constitutional rights, the courts do not defer to the agency's findings, but conduct a de
novo review.  *Poett v. United States*, 657 F.Supp.2d 230, 241 (D.D.C. 2009).  *See also  Lead
Industries Ass'n, Inc. v. Environmental Protection Agency*,  647 F.2d 1130, 1174 (D.C. Cir.
1980).   Accordingly, the court's inquiry is not limited to the administrative record on the due
process issue.

in the Stop Sale Order that Impurity X was toxicologically significant was arbitrary or

unreasonable.   Instead, AMVAC asserted:

> AMVAC does not believe that the impurities, which have long been
> known to EPA, have any toxicological significance *at the levels at which they
> have been detected*.  In any case, to the extent EPA has changed its position, EPA
> has not afforded AMVAC any formal opportunity to submit revised information
> on product identity and composition or a revised CSF to remedy any purported
> deficiencies in this registration.

*Id*. at 1-2 (emphasis added).  AMVAC went on to assert that the Stop Sale Order effectively

nullifies its FIFRA registrations and so EPA should have proceeded against AMVAC under

FIFRA's provisions for cancelling or suspending a registration or at least should have complied

with the procedural requirements that the Administrative Procedure Act, 5 U.S.C. § 558(c), sets

forth for agency actions to withdraw licenses.  *Id*. at 2.

In its written response to the AMVAC Letter, the Agency explained that FIFRA section

12 prohibits the sale and distribution of pesticides that differ in composition from the applicable

CSF and that section 13 authorizes EPA to issue a Stop Sale Order when there is reason to

believe that the pesticide has or will be sold in violation of FIFRA.  Letter from R. Kelley,

Director, Waste and Chemical Enforcement Division, EPA, to L. Campbell and T. Backstrom,

Bergeson & Campbell, P.C. (Aug. 26, 2010) ("EPA Response").  Exhibit 10.  EPA further

explained that the new test data generated in January 2010 supported EPA's conclusion that

AMVAC's PCNB contains impurities of toxicological significance that are not identified in the

CSF and therefore reason to believe that further sales of the PCNB would violate FIFRA.  *Id*. at

2.  EPA specifically addressed the 1993 submission:

> While AMVAC did submit some data to EPA on these impurities under FIFRA §
> 6(2)(a) in 1993, that submission does not relieve AMVAC from its obligation to
> sell a product consistent with the terms of its approved registration (which would

9

have been reviewed, among other things, for conformance with EPA's product chemistry requirements).

*Id*. at 1.

## C.   LITIGATION BACKGROUND

AMVAC filed its complaint on August 27, 2010, and moved for a temporary restraining order to bar enforcement of the Stop Sale Order.  This Court denied AMVAC's motion on September 2, 2010.  The Court explained that AMVAC's principle claim was "that EPA is depriving AMVAC of its ability to engage in its business of selling the pesticide PCNB, and is in essence having issued the stop sale order, revoking AMVAC's license to sell its product, PCNB."  Tr. 54.  The Court stated that there was no dispute over the fact that the CSF for PCNB did not include Impurity X and found that EPA had never licensed PCNB that included Impurity X in its chemical composition under FIFRA.  *Id*.  at 53.  Accordingly, the Court ruled that the Stop Sale Order did not revoke AMVAC's registration or deprive AMVAC of its business of selling PCNB of the same composition as identified in the CSF:  "What's being stopped is the sale of something that is not described in the current confidential statement of formula and registration materials on file."  *Id*. at 54.  On this basis, the Court held that AMVAC had failed to show that there was a likelihood that it would succeed on the merits of its claim that it had been deprived of a property right without due process.  *Id*.

The Court also addressed AMVAC's claim that EPA's decision to issue the Stop Sale Order was arbitrary or capricious.  *Id*.  The Court focused primarily on the fact that, in 1993, AMVAC had submitted a notice to EPA that it had detected Impurity X in a batch of PCNB. The Court was "troubled" that EPA had not taken any action regarding the presence of Impurity

X for 17 years, but concluded that the Agency's inaction in 1993 did not restrict the Agency's authority to issue the Stop Sale Order in 2010. *Id.* at 56.

## STANDARD OF REVIEW

FIFRA claims are subject to the standard of review established by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *Defenders of Wildlife v. EPA*, 882 F.2d 1294, 1303 (8th Cir. 1989). APA Section 706(2) permits a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A). The court's review is limited to the administrative record compiled and relied on by the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

Review under the "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (citations omitted). Under this deferential standard of review, there is a strong presumption in favor of upholding decisions of agencies acting within their scope of agency expertise in technically complex areas. *Oregon Natural Res. Def. Council*, 490 U.S. at 375, 378; *Friends of the Earth v. Corps of Engineers*, 109 F. Supp. 2d 30, 35-36 (D.D.C. 2000). "[A]gency action is arbitrary and capricious if an agency has entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Friends of the Earth*, 109 F. Supp. 2d at 34 (internal quotation marks and citations omitted). In reviewing an agency's scientific fact findings, the Court must give "extreme deference." *City of Waukesha v. EPA*, 320 F.3d 228, 247 (D.C. Cir. 2003) (per curiam). In sum, EPA's decision to issue the Stop Sale Order can be set aside only if

11

the Court finds that EPA abused its discretion, or acted arbitrarily, capriciously, or contrary to law. *Overton Park*, 401 U.S. at 416.

## ARGUMENT

### I.   AMVAC'S REGISTRATION DOES NOT AUTHORIZE THE SALE OR DISTRIBUTION OF PCNB CONTAINING IMPURITY X

AMVAC does not dispute that its CSF does not identify Impurity X as a component of PCNB.  Instead, AMVAC maintains that because EPA approved unrelated amendments to the CSF after AMVAC had notified EPA in 1993 that Impurity X had been detected in *one* batch of PCNB, "EPA necessarily and expressly determined that the composition was correct, and that the product as manufactured was not in violation of any provision of FIFRA, including FIFRA Section 12(a)(1)(C)."  Pltf. Br. at 18.  This argument suffers from two flaws.  First, it is based in part on documents that are not part of the administrative record.  Second, these documents, even if considered by the Court, do not support AMVAC's claim that the registration authorizes the sale of PCNB containing Impurity X, despite AMVAC's failure to include Impurity X on the CSF.

### A.   AMVAC Improperly Relies on Extra-record Material.

Judicial review of the Stop Sale Order "is limited to the administrative record compiled and relied on by the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  The record presented by EPA is entitled to a presumption of regularity; courts assume that the agency properly designated the record absent clear evidence to the contrary. *Overton Park*, 401 U.S. at 415-16.  While supplementation of the administrative record is allowed, it is not favored; the D.C. Circuit does not allow a party to supplement the record "unless they can demonstrate unusual circumstances justifying a departure from this general

12

rule." *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991)

(quoted in *American Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)).  In

*American Wildlands*, the court identified three circumstances where supplementation has been

allowed:

> (1) The agency deliberately or negligently excluded documents that may have
> been adverse to its decision; (2) the district court needed to supplement the record
> with background information in order to determine whether the agency considered
> all of the relevant factors; or (3) the agency failed to explain administrative action
> so as to frustrate judicial review.

 (internal quotation marks and brackets omitted).

AMVAC has chosen simply to introduce extra-record documents (*i.e.*, documents

relating to the CSF amendments between 1999 and 2003, as well as an internal EPA response to

AMVAC's 1993 notice regarding the presence of Impurity X in PCNB product) without moving

to supplement the record and without even attempting to make the showing required by

*American Wildlands*.  By failing even to try and meet its burden in conjunction with its opening

brief, AMVAC has waived its opportunity to seek to supplement the administrative record.[8]

Accordingly, the Court should not consider either the extra-record documents or the arguments

premised on those documents.

### B.    AMVAC's Claim that EPA Has Approved the Sale and Distribution of PCNB Containing Impurity X Is Without Merit.

AMVAC's claim is premised on a notice submitted to EPA in 1993 by AMVAC

reporting that Impurity X had been detected in one batch of PCNB.  Letter from J. Vasquez,

---

[8]    AMVAC cannot later cure this failure by presenting arguments for supplementation in its
reply brief as arguments cannot be presented for the first time in a reply.  *See In Defense of
Animals v. Salazar*, 675 F. Supp. 2d 89, 101 (D.D.C. 2009) (citing *McBride v. Merrell Dow &
Pharmaceuticals, Inc.*, 800 F.2d 1208, 1211 (D.C.Cir.1986)).

13

AMVAC, to FIFRA Section 6(a)(2) Document Processing Desk, EPA (July 2, 1993) and

attachment (AR Doc. 36, EPA 00522-42) (Exhibit 11).  The notice was submitted pursuant to

section 6(a)(2) of FIFRA, which requires a registrant to submit to EPA any "factual information

regarding unreasonable adverse effects on the environment of the pesticide" that becomes known

to the registrant after the registration is approved.[9]  7 U.S.C. § 136d(a)(2).  AMVAC also points

to a follow-up document not in the record showing that, after this notice was received, it was

reviewed by a former EPA employee, who marked the item for "a routine, non-expedited

review."  AMVAC 00111.  There are no documents in the administrative record for the Stop Sale

Order concerning that review or any related actions taken by EPA thereafter.  AMVAC also

points to documents from subsequent years when EPA approved changes in the CSF unrelated to

Impurity X.  AMVAC 00113-00122.

　　　AMVAC does not contend that any of the amendments that EPA approved after the 1993

submission addressed Impurity X or that EPA actually considered Impurity X in approving those

amendments.  Indeed, there is no evidence that anyone involved in reviewing those amendments

was even aware of the 1993 submission.  Instead, AMVAC argues that, as a matter of law, the

Court should presume that EPA considered the information from 1993 regarding Impurity X

each time the Agency took action on the PCNB registration, including the CSF.  According to

AMVAC's theory, the fact that EPA approved revisions to the CSF after receiving the 1993

notice necessarily means that EPA had concluded that the identification of Impurity X on the

CSF was *not* required by 40 C.F.R. § 158.320(c).  AMVAC contends that, under these

---

[9]　　　EPA does not concede that submission of the 1993 letter constituted compliance with
section 6(a)(2) of FIFRA.

circumstances, the sale and distribution of PCNB containing Impurity X cannot be a violation of FIFRA section 12(a)(1)(C), 7 U.S.C. § 136j(a)(1)(C).

The fact that the Agency did not take enforcement action or otherwise compel AMVAC to submit an amendment to the CSF upon receipt of the 1993 submission cannot be transformed into an affirmative decision by the Agency that Impurity X was not toxicologically significant and so did not have to be identified on the CSF.  Nor can the Agency's lack of action on the 1993 submission estop EPA from taking enforcement action today in light of new information (the testing in 2009 and 2010) showing that Impurity X is currently present in AMVAC's PCNB products.  The courts have recognized a "general rule that the Government is never disabled from protecting the public interest by reason of the past mistakes of its agents." *Udall v. Oelschlaeger*, 389 F.2d 974, 977 (D.C. Cir. 1968) (citing *Utah Power & Light Co. v. United States*, 243 U.S. 389 (1916)).

Accordingly, the documents pertaining to AMVAC's 1993 submission and subsequent amendments to the CSF have no bearing on the question of whether the sale and distribution of PCNB containing Impurity X is a violation of section 12(a)(1)(C).

## II. THE COURT SHOULD REJECT AMVAC'S ARGUMENT THAT EPA MUST PROCEED UNDER FIFRA SECTION 6, RATHER THAN SECTION 13(a), TO HALT THE SALE OF PESTICIDE PRODUCTS THAT DO NOT COMPLY WITH THE APPLICABLE REGISTRATION

### A. The Stop Sale Order Does Not Affect The Status Of The Registration.

AMVAC contends that, because the Stop Sale Order revokes the PCNB registration, EPA must follow the detailed procedural requirements set forth in FIFRA section 6.   As the Court has already found, this argument is wrong.  The Stop Sale Order does not cancel, suspend, or otherwise revoke AMVAC's registration; it is directed at the pesticide that EPA believes is

15

inconsistent with what was submitted to and approved by EPA as part of the registration.[10]

Therefore, EPA properly proceeded under section 13(a) to issue the Stop Sale Order.  EPA

concedes that if the Court determines that AMVAC's existing registration allows the sale of

PCNB containing Impurity X, even though Impurity X is not identified on the current CSF, the

Stop Sale Order should be vacated.  But, as explained below, FIFRA contains no legal

requirement that EPA to initiate cancellation action under FIFRA section 6, rather than take

action under section 13, when a pesticide product is being sold outside the permitted scope of its

registration.

### B.      FIFRA Allows EPA To Issue The Stop Sale Order Without Initiating Proceedings To Cancel Or Suspend AMVAC'S PCNB Registration.

AMVAC contends that EPA cannot issue a Stop Sale Order under FIFRA section 13(a)

for a registered pesticide such as PCNB without first cancelling or suspending the registration

pursuant to the procedures of FIFRA section 6.  Pltf. Br. at 15-18.  This argument ignores the

essential fact in this case, that the Stop Sale Order was issued because AMVAC was marketing a

pesticide inconsistent with the terms of its approved registration.  Moreover, the argument is

inconsistent with the plain language of section 13(a), which authorizes EPA to issue a Stop Sale

Order in three circumstances set forth in the disjunctive:

---

[10]      For the same reason, AMVAC's reliance on the Administrative Procedure Act's procedural requirements for revoking or suspending a license, 5 U.S.C. § 558(c), is misplaced. *See* Pltf. Br. 21-22.  The generic procedures of the APA do not apply to FIFRA proceedings. The terms used in section 558(c) are essentially synonyms for cancellation or suspension of a license.  In section 6 of FIFRA, Congress established very specific procedural requirements that EPA must meet to suspend or cancel FIFRA registration (which is a license).  If EPA were to cancel AMVAC's registration, EPA would have had to comply with the requirements of section 6, and could not have chosen instead to rely on the far less demanding requirements of section 558(c).  Therefore, even if this were an action against a registration, 5 U.S.C. § 558(c) would be irrelevant.

> [w]henever any pesticide or device is found by [EPA] in any State and [1] there is
> reason to believe on the basis of inspection or tests that such pesticide or device is
> in violation of any of the provisions of this subchapter, or [2] that such pesticide
> or device has been or is intended to be distributed or sold in violation of any such
> provisions, or [3] when the registration of the pesticide has been canceled by a
> final order or has been suspended.

7 U.S.C. § 136k(a) (emphasis added).  Clause number 3 makes absolutely clear that EPA can

issue a Stop Sale Order under clauses 1 and 2 without first cancelling or suspending a

registration.   Otherwise, the first two clauses would be surplusage and a basic rule of statutory

construction provides that "a court must, if possible, give effect to every phrase of a statute so

that no part is rendered superfluous."  *National Insulation Transp. Committee v. I.C.C.*, 683 F.2d

533, 537 (D.C. Cir. 1982).   Moreover, the first two clauses in the statutory provision cited above

establish that Congress has authorized EPA to issue a stop sale order when there is reason to

believe that "any" pesticide is in violation of FIFRA or will be sold or distributed in violation of

FIFRA.   There is no basis for AMVAC's suggestion that registered pesticides are not included in

the statutory term "any pesticide."   Accordingly, AMVAC's suggestion that EPA must go

through a cancellation or suspension proceeding to stop the violations of FIFRA section 12

resulting from the sale and distribution of PCNB pesticides that differ in composition from the

approved CSF must be rejected as inconsistent with the plain language of the statute.

   To support its claim that section 13(a) does not authorize action against a registered

pesticide, AMVAC points to FIFRA section 3(f)(2):

> In no event shall registration of an article be construed as a defense for the commission of
> any offense under this subchapter.  *As long as no cancellation proceedings are in effect
> registration of a pesticide shall be prima facie evidence that the pesticide, its labeling
> and packaging comply with the registration provisions of the subchapter.*

7 U.S.C. § 136a(f)(2) (emphasis added).   AMVAC asserts that, because of this provision, "a

violation necessarily cannot be based on a fact or condition that EPA determined was appropriate

17

under FIFRA 3(c)(5) when it granted the registration." Pltf. Br. at 8.  AMVAC quotes the emphasized sentence to suggest that EPA cannot exercise its enforcement authority with respect to a registered pesticide unless cancellation proceedings have begun. *Id*. at 15-16. *See also id*. at 8.

AMVAC's argument would effectively turn a FIFRA registration into an absolute defense, despite the explicit statutory language to the contrary.   Instead, section 3(f)(2) establishes that  the registration is not a defense, but only evidence, which can be rebutted, of compliance with FIFRA's registration provisions. *See Kimbro v. Velten*, 30 F.3d 1501, 1505 (D.C. Cir. 1994) (prima facie evidence by defendant puts burden on plaintiff to introduce sufficient rebuttal evidence).   Thus, the statute establishes that AMVAC's PCNB registration has certain evidentiary weight in an enforcement proceeding, but does not preclude EPA from exercising its enforcement authority, including its authority under section 13(a).

Finally, AMVAC points to the legislative history to the 1964 amendments to FIFRA, which established the administrative procedure for cancelling or suspending a registration.  Pltf. Br. at 18 (citing H.R. Rep. No. 88-1125, *as reprinted in* 1964 USCCAN 2166, at 2167). According to AMVAC, this history shows that allowing EPA to issue a stop sale order applicable to a registered pesticide would defeat Congress's intent in establishing these procedures. AMVAC, however, fails to even show that it is appropriate for the Court to consider the legislative history.

"It is well established that "when the statute's language is plain, the sole function of the courts - at least where the disposition required by the text is not absurd - is to enforce it according to its terms." *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004).  Consideration of the legislative history is unnecessary where the statute is clear. *Donnelly v. FAA*, 411 F.3d

18

267, 272 (D.C. Cir. 2005).  *See also United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d

488, 494 (D.C. Cir. 2004).  AMVAC has not identified any ambiguity in section 13(a) that would

warrant consideration of legislative history.  Section 13(a) authorizes EPA to issue a stop sale

order when there is reason to believe that "any" pesticide is in violation of FIFRA or will be sold

or distributed in violation of FIFRA, *as well as* when the registration of a pesticide has been

canceled or suspended.  By using such broad terms, Congress forestalled any serious claim that

the statute is ambiguous as to whether EPA can use its authority under section 13(a) to prevent

the sale, distribution, or use of a registered pesticide where warranted.

Finally, AMVAC has not shown that applying section 13(a) as written will produce an

absurd result.  Obviously, AMVAC is correct is asserting that section 6 of FIFRA affords the

registrant greater procedural rights than does section 13(a), which does not require that EPA

adhere to specific procedures, such as providing notice or an opportunity for a hearing, before

taking final action.  There is nothing absurd, however, in the conclusion that, in a statute

designed to protect public health, Congress also allowed EPA to use section 13(a) when

appropriate, even assuming that EPA could have chosen instead to initiate a cancellation

proceeding in the particular circumstances.  At bottom, AMVAC is arguing that the language

used by Congress in section 13(a) does not reflect Congress' "real" intent.  That argument must

be addressed to Congress, not the Court.

> If Congress enacted into law something different from what it intended, then it
> should amend the statute to conform it to its intent.  It is beyond our province to
> rescue Congress from its drafting errors, and to provide for what we might think
> . . . is the preferred result.

19

*Lamie*, 540 U.S. at 542. [11]

## III.   THE STOP SALE ORDER IS CONSISTENT WITH FIFRA AND SUPPORTED BY THE ADMINISTRATIVE RECORD

In order to prevail in this matter, AMVAC must show that EPA's decision to issue the

Stop Sale Order was arbitrary, capricious, or otherwise inconsistent with law.  AMVAC has

failed to meet this burden.

Section 13(a), in relevant part, authorizes EPA to issue a Stop Sale Order when "there is

reason to believe on the basis of inspection or tests that such pesticide or device is in violation of

any of the provisions of this subchapter, or that such pesticide or device has been or is intended

to be distributed or sold in violation of any such provisions."  EPA issued the Stop Sale Order

after laboratory analysis of PCNB samples showed that the product currently being sold or

distributed by AMVAC contained Impurity X.  *Id*. ¶¶ 16-17.  The Agency concluded that

Impurity X is "a substance or class of substances known to be of toxicological significance."

*Id*.[12]  EPA further found that the CSF for AMVAC's PCNB did not identify the presence of

---

[11]     It must be noted that AMVAC is relying on a committee report from a 1964 amendment to section 6 to construe section 13(a), which was added to FIFRA in its present form in 1972. Pub. L. No. 92-516, 86 Stat. 973, 991-92 (1972).  The courts "assume that Congress is aware of existing law when it passes legislation."  *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 351 (1998).  AMVAC is asking the Court to accept that the language adopted by Congress in 1972 vitiates Congress' purpose in establishing the cancellation and suspension provisions adopted eight years earlier.   There is no basis to suggest that Congress did not consider its own intent with respect to cancellation and suspension proceedings when it later authorized EPA to issue stop sale orders.

[12]     AMVAC criticizes EPA's references to "substances" and "classes of substances" in addressing impurities.  This terminology comes from the regulatory definition of "impurity" as "any substance (or group of structurally similar substances if specified by the Agency), in a pesticide product other than an active ingredient or an inert ingredient, including unreacted starting materials, side reaction products, contaminants, and degradation products."  40 C.F.R. § 158.300.  Accordingly, AMVAC's criticisms are unfounded.

Impurity X in the product, and therefore did not comply with section 3 of FIFRA and its implementing regulations, which require that the CSF must adequately identify the composition of the product.  *Id.* ¶ 18.

Based on these findings, EPA concluded that there was reason to believe that the CSF did not accurately reflect that composition of the PCNB and that AMVAC has been selling and distributing pesticides in violation of section 12(a)(1)(C) of FIFRA, 7 U.S.C. § 136j(a)(1)(C).  Order ¶ 22.   Section 12(a)(1)(C)  establishes that it is unlawful to sell or distribute "any registered pesticide the composition of which differs at the time of its distribution or sale from its composition as described in the statement required in connection with its registration."  *See* Order ¶ 3.  These findings satisfied the criteria established in section 13(a) for issuing the Stop Sale Order.

AMVAC does not contest EPA's conclusions that PCNB contains Impurity X and that Impurity X is not identified in the CSF.  Instead, AMVAC contends that EPA did not inform AMVAC that Impurity X is "toxicologically significant" for purposes of AMVAC's PCNB registration, and therefore AMVAC cannot be penalized for the presence of Impurity X in PCNB when it does not appear on the product's CSF.  AMVAC has put the cart before the horse.

Section 158.320(c) specifies the information that a registrant must provided to EPA:

for each impurity associated with the active ingredient that is determined by EPA to be toxicologically significant . . .:

(1) Identification of the ingredient as an impurity.
(2) The chemical name of the impurity.
(3) The nominal concentration of the impurity in the product.
(4) A certified upper limit, in accordance with § 158.350.

Tellingly, although AMVAC claims that EPA has never made the determination, AMVAC never asserts that Impurity X is *not* toxicologically significant.[13]  In fact, the dangers posed by Impurity X have been long recognized.  Over thirty years ago, it was recognized as "one of the most teratogenic chemicals known."[14]  More importantly, for present purposes, however, is the fact that EPA identified Impurity X as toxicologically significant in 1988 when the Agency promulgated 40 C.F.R. § 158.320(c).  53 Fed. Reg. at 15,973.[15]  In the preamble to the final rule, EPA explained that commenters had objected to the lack of criteria for determining toxicological significance of an impurity.  In response, EPA

> identified in two ways impurities for which it believes that certified limits are necessary.  *The first is a list of specific substances or classes of substances of known toxicological concern.*  In some cases, the listed substances are currently or have been the subject of regulatory action against pesticide products because of the risks posed by their presence as impurities in the product.  In other cases, they are identified because historically they are known to contribute significantly to the toxic profile of an active ingredient.  The second is a set of criteria for substances which are potentially of toxicological significance; in this latter list, no specific substances are named.

---

[13]     AMVAC does complain that the Stop Sale Order "does not allege that EPA determined that *the amount* of Impurity X present in Technical Grade PCNB is 'toxicologically significant.'" Pltf. Br. at 13 (emphasis added).  Under the language of section 158.320(c), however, the amount of the impurity present does not affect the registrant's obligations.  *Compare with* 40 C.F.R. § 40 C.F.R. § 158.320(d) (requires information regarding any "other" impurity only if impurity is present above a specific concentration).

[14]     The citation for this statement is in Exhibit 12 and is filed under seal because the decision would identify Impurity X.

[15]     This regulation was originally codified at 40 C.F.R. ¶ 158.155.  In 2007, the Agency revised and renumbered its FIFRA rules.  This section was modified slightly to clarify that EPA would make the determination as to whether an impurity was of toxicological significance.  72 Fed. Reg. 60,934, 60,971 (Oct. 27, 2007).  The Agency, however, did not change the list of substances identified in the 1988 Preamble.

*Id*. at 15,973 (emphasis added).  The list included Impurity X.[16]  This same list is included in

EPA's Product Property Test Guidelines, OPPT 830.1000, "Background for Product Properties

Test Guidelines," 11 (Mar. 1998), which consolidates the Guides identified in 40 C.F.R.

§158.310(e).  (Exhibit 13).  Thus, EPA made the determination that Impurity X was

toxicologically significant and required upper certified limits for purposes of 40 C.F.R. §

158.320(c) many years before the Stop Sale Order was issued.

There is no validity to AMVAC's complaint that EPA should not be able to rely on the

Preamble because it is not cited in the Stop Sale Order and is not in the administrative record.

Pltf. Br. at 38.  AMVAC cites no support for its suggestion that, in applying a specific regulation,

EPA must specifically cite to the Preamble issued when that regulation was promulgated if it

intends to rely on the Preamble.  Once the Preamble is published in the Federal Register, it is

presumed that the Agency and all other parties are fully aware of its contents and can rely on it

as appropriate in applying the regulation.  AMVAC similarly fails to cite any support for the

proposition that the administrative record must identify all Federal Register notices on which the

Agency has relied.

AMVAC next contends that EPA cannot rely on the 1988 list as a determination by EPA

that the particular impurity is of toxicological significance.  First, AMVAC complains that the

list identifies "classes of substances of known toxicological concern," which AMVAC appears to

suggest is different than identifying impurities of toxicological significance.  Pltf. Br. at 38

(quoting 53 Fed. Reg. at 15,973).  AMVAC's argument fails because it is premised on taking one

sentence in isolation, instead of reading the discussion as a whole.  EPA plainly stated that the

---

[16]      AMVAC has never denied that Impurity X is included in the listed substances and classes
of substances in the Preamble.

purpose of the whole discussion was to provide specific criteria to define which impurities were

toxicologically significant and so subject to the requirement that certain information, including

certified upper limits, must be submitted by the registrant pursuant to 40 C.F.R. § 158.320(c).

The sentence that AMVAC points to is EPA's explanation of the criteria the Agency used in

identifying the impurities listed.  When this sentence is read in context of the discussion as a

whole, the flaw in AMVAC's argument is clear.

AMVAC also complains that EPA cannot rely on the 1988 list because it was not

promulgated as a legislative rule and was not subject to notice and comment.  Pltf.  Br. at 38.

The fact is that the list was formulated in response to comments received on the rule establishing

the reporting requirements on which this entire action is based.  The Agency specifically

concluded that the list should not be incorporated in the final rule because it was not exclusive:

> This list is not exhaustive, and EPA does not intend it to be.  The list may be
> expanded as new information on impurities becomes available.  For that reason,
> the list is not included in the final rule.  EPA will update the list periodically, and
> make it available to registrants and the public, or may publish it in the Federal
> Register.  EPA has reserved the right to require certified limits for other
> impurities on a case-by-case basis.  Registrants should contact the Agency if there
> is a question about the status of any individual impurity not listed.

53 Fed. Reg. at 15,973.  Thus, the Agency's decision regarding the list is categorized as an

interpretative rule, which explains how EPA intends to apply the requirements of 40 C.F.R. §

158.320.  *See Fertilizer Institute v. United States Environmental Protection Agency,* 935 F.2d

1303, 1308 (D.C. Cir. 1991).  Accordingly, it is a plain statement of the Agency's position set

forth in the Federal Register.  While it could have been challenged in a timely petition for

review, the time for such action has long since passed.

Moreover, AMVAC's complaints that EPA's statements in the Preamble and Guidance

cited above are not "proper" determinations are inconsistent with AMVAC's own claim that the

Court should look at Pesticide Regulation, PR Notice 96-8, as a model for what EPA should have done here. Pltf. Br. at 41. This document is a notice that sets out EPA's requirements with respect to "'toxicologically significant" contaminants in pesticides when the contaminants are also pesticide active ingredients. As such, it is not applicable here because Impurity X is not a pesticide active ingredient. More importantly, however, a PR notice is not a legislative rule. AMVAC's own reliance on PR 96-8 as an example of a valid determination of toxicological significance undermines its argument that EPA's determination in the preamble with respect to Impurity X is not worthy of reliance because it is not a legislative rule.

## IV.   AMVAC'S DUE PROCESS CLAIM IS WITHOUT MERIT

AMVAC claims that EPA failed to provide the process due under the Fifth Amendment before issuing the Stop Sale Order. The Court previously rejected this claim after finding that AMVAC had no protected property interest in selling PCNB that was different in composition than identified in the current CSF. Tr. at 54. AMVAC has provided no reason why the Court should reconsider its decision now.

Even assuming that AMVAC had a protected property interest, however, AMVAC received all the process appropriate in the circumstances of this case. AMVAC claims that it did not have notice that an amendment to the CSF was required to identify the presence of Impurity X and to establish certified upper limits for the amount of Impurity X that could be present in its PCNB products as required by 40 C.F.R. § 158.320(c). During the earlier proceedings before this Court, the parties introduced declarations showing that there was a factual dispute as to whether EPA notified AMVAC that an amendment to the CSF was required to address the presence of Impurity X in the samples tested in 2010. It is not necessary to resolve this dispute, however, because AMVAC had notice as a matter of law.

EPA announced its decision that Impurity X was of toxicological significance and that a CSF should contain certified upper limits in the regulatory preamble, which was published in the Federal Register in 1988.  53 Fed. Reg. at 15,973.  "Publication in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance, except those who are legally entitled to personal notice." *State of California ex rel. Lockyer v. F.E.R.C.*, 329 F.3d 700, 707 (9th Cir. 2003).  Thus, AMVAC had full notice that it was required to include Impurity X and certified upper limits on its CSF.

AMVAC also complains that it was not given an opportunity to respond to EPA's conclusion that there had been a violation of FIFRA section 12(a)(1)(C) before the Stop Sale Order was issued.  "The essence of due process is the requirement that a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it." *Mathews*, 424 U.S. at 348 (citation and internal quotes omitted).   This does not mean that a full evidentiary hearing is always necessary; it is enough that procedures be in place to provide "an effective initial check against mistaken decisions."  *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 261-62 (1987).  Indeed, as the D.C. Circuit has recognized, "[i]f every government decision required a full blown hearing involving all the parties affected, the conduct of Government business would be greatly impaired."  *Old Dominion Dairy Prods., Inc. v. Secretary of Defense*, 631 F.2d 953, 968 (D.C. Cir. 1980).

Here, EPA gave AMVAC numerous informal opportunities to be heard both before and after issuance of the Order with regard to the legal consequences of the test samples showing the presence of Impurity X.  *See infra* 7-9.  As stated above, AMVAC had notice, as a matter of law, that EPA had determined that Impurity X was toxicologically significant and upper certified limits were required.  AMVAC is a sophisticated chemical company that is well-versed in the

26

requirements of FIFRA and the nature of its own products.  AMVAC is quite capable of

comprehending and protecting its interests, even in an informal setting, particularly where the

issue involved is technical in nature.  Under these circumstances, the informal process afforded

AMVAC was more than sufficient.  *See Old Dominion Dairy Products, Inc. v. Secretary of

Defense*, 631 F.2d at 968.

Even if AMVAC could show that it did not have notice before the Stop Sale Order was

issued, the federal courts have recognized that a post-deprivation opportunity to be heard will

satisfy due process in appropriate circumstances.   After the Order was issued, EPA received and

responded to written objections presented by AMVAC's counsel.  *See infra* 8-9.   A temporary

deprivation of property without a prior hearing may be justified depending on the balance

between three factors: (1) "the private interest that will be affected by official action;" (2) "the

risk of an erroneous deprivation of such interest through the procedures used, and the probable

value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's

interest, including the function involved and the fiscal and administrative burdens that the

additional or substitute procedural requirement would entail."  *Mathews*, 424 U.S. at 335.

Here AMVAC's interest is economic – lost sales revenue.  Economic interests have been

found to be less compelling than others.  *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085,

1100 (D.C. Cir. 1996) (finding the seizure of a business a less "compelling" private interest than

interest in avoiding government interference with home or furniture).  Lost revenue is certainly a

less significant interest than the public interest in avoiding exposure to pesticides that have not

been fully evaluated and approved by EPA under FIFRA.  *See Walters v. Nat'l Ass'n of

Radiation Survivors*, 473 U.S. 305, 323-26 (1985) (according significant weight to longstanding

congressional purpose in assessing government interest).

Given the limited nature of the dispute at issue, there was not an appreciable risk that AMVAC would be unable to fully present its position in writing or at a meeting and thus, little risk that delaying the opportunity to be heard until after issuance of the Stop Sale Order would lead to an error in the agency's decision. *See SCA Services of Indiana, Inc. v. Thomas*, 634 F. Supp. 1355, 1373-74 (N.D. Ind. 1986). AMVAC does not challenge the presence of Impurity X in the product subject to the Stop Sale Order or the absence of Impurity X on the CSF. In fact, AMVAC never directly asserts that Impurity X is not toxicologically significant, without also raising the legally-irrelevant issue of the concentration of Impurity X in its product. *See infra* 22, n.13 The only real dispute here is whether EPA has determined that Impurity X is toxicologically significant – an issue resolved by EPA in the 1998 preamble. Additional process would not have advanced the resolution of this issue. Finally, EPA has an interest in keeping its enforcement proceedings expeditious to minimize public exposure to substances that could pose a risk to human health and the environment.

AMVAC has had the opportunity both before and after the Stop Sale Order was issued to provide information showing that Impurity X is *not* toxicologically significant. It has failed to do so. There is no reason to expect that further proceedings would be of use. AMVAC has received the process due in these circumstances, even assuming that it had a protected property right that would trigger due process requirements.

## V.   AMVAC'S COMPLAINTS CONCERNING THE ADMINISTRATIVE RECORD SHOULD BE DISREGARDED

AMVAC raises a host of complaints regarding the content and preparation of the administrative record but fails to substantiate them.  AMVAC complains that the record was not maintained contemporaneously but was assembled after the litigation commenced.  AMVAC, however, does not cite any statute or regulation requiring that EPA maintain a contemporaneous docket for an order under FIFRA section 13(a).  AMVAC also complains that the certified index to the record was not signed under penalty of perjury but cites no authority that would support its contention that such action was required.

The remainder of AMVAC's arguments boils down to the assertion that EPA included documents that should not have been in the administrative record, while failing to include others that should have been included.  As explained above, AMVAC has failed to make the showing required by *American Wildlands* to supplement the record.  With respect to the claim that the record contains extra material, AMVAC has failed to explain how it is injured by the inclusion of that material.  At most, such over-inclusiveness would be harmless error and so cannot constitute a basis for granting AMVAC any relief.  *See Consolidated Gas Supply Corp. v. Federal Energy Regulatory Comm'n*, 606 F.2d 323, 328 (D.C. Cir. 1979).

### CONCLUSION

The Court should deny AMVAC's motion for summary judgment and grant the cross-motion for summary judgment filed by EPA.

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

/s/ EILEEN T. MCDONOUGH
Environmental Defense Section
U.S. Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
(202) 514-3126
eileen.mcdonough@usdoj.gov


OF COUNSEL:

Michele Knorr
Angela Huskey
Andrea Medici
Office of General Counsel
United States Environmental Protection Agency