# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERICAN VANGUARD CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 10-cv-1459 (RCL) |
| LISA JACKSON, Administrator, United States Environmental Protection Agency, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

# MEMORANDUM OPINION

## I.    INTRODUCTION

Last Autumn, the U.S. Environmental Protection Agency ("EPA" or the "Agency") issued a Stop Sale, Use or Removal Order ("SSURO") to plaintiff American Vanguard Corporation ("AMVAC"). The SSURO instructed AMVAC to cease the manufacture and distribution of a pesticide marketed by the company to golf courses throughout the United States, and mandated that the company destroy all remaining stockpiles of the product. EPA insists that AMVAC was selling a pesticide that deviated from the formula registered with, and approved by, the Agency. AMVAC, however, protests that EPA has known about the full chemical composition of the pesticide since 1993, and has repeatedly approved the distribution of the product in its current state. Wherever the truth lies, one fact is beyond dispute: the SSURO was signed by Rosemarie A. Kelley, the Director of the Agency's Waste and Chemical Enforcement Division ("W&C Division"). AMVAC argues that Director Kelley lacks legal authority to issue the SSURO, rendering the Agency's action legally infirm. The Court agrees, and will therefore vacate the SSURO and remand this matter to EPA for additional proceedings.

## II.     BACKGROUND

The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or the "Act"), 7 U.S.C. §§ 136 *et seq.*, governs the manufacture and sale of various potentially toxic agricultural products by mandating that "no person . . . may distribute or sell to any person any pesticide that is not registered." *Id*. § 136a(a).  Under the FIFRA, EPA is charged with maintaining and enforcing a licensing scheme for all products that meet the statutory definition of "pesticide" found in § 136(u) of the Act.  *Id*.  As part of this process, EPA regulations instruct that any entity wishing to register a pesticide must furnish the Agency with certain information, including the identification of any "[i]mpurities of toxicological significance associated with the active ingredient."  40 C.F.R. § 158.320(c).

AMVAC, a manufacturer and distributor of various agricultural products, markets a pesticide product whose active ingredient is Technical Grade PCNB.[1]  The product—which has been a registered pesticide under the FIFRA since October 9, 1985, P's App. 108, Ex. 3 to Motion for Summary Judgment, Oct. 15, 2010 [17-3][2]—prevents the accumulation of "snow mold," and is sold primarily to golf courses for use on fairways and greens during the winter months.  *Id*. at 332.  In 1993, AMVAC discovered that an impurity—referred to as Impurity X[3]—is created during the manufacturing process for Technical Grade PCNB, and remains part of the product sold by the company.  *Id*. at 83.  Both sides agree that AMVAC immediately reported the presence of Impurity X to EPA, Answer ¶ 16, Oct. 26, 2010 [18]; at this point, however, their stories diverge.  According to AMVAC, EPA designated the information for a

---

[1] PCNB is shorthand for the chemical compound pentachloronitrobenzene.
[2] AMVAC has submitted an extensive appendix of material outside EPA's official administrative record to the Court, all of which is Bates stamped "AMVAC -----."  Citations to this record are to "P's App."
[3] According to AMVAC, the identity of Impurity X constitutes confidential business information, Complaint ¶ 27 n.2, Aug. 27, 2010 [1], and thus AMVAC uses the pseudonym "Impurity X" throughout its briefings.  Because EPA does not object to the use of a pseudonym at this time, Answer ¶ 27 n.1, Oct. 26, 2010 [18], the Court will adhere to this adopted convention.

2

"routine non-expedited review," P's App. 112, and—over the next fifteen years—repeatedly approved updates and amendments to the Technical Grade PCNB formula registered with the Agency without ever questioning the omission of Impurity X from AMVAC's submissions. *Id*. at 113–19. According to EPA, however, it was never aware that Impurity X was present in manufactured Technical Grade PCNB in *all* instances, and only became aware of potential problems with the composition of the product as marketed after the results of studies in both Australia and Canada were made public in late 2009. But in whatever manner the parties arrived at this point, the following is clear: On August 12, 2010, the Director of EPA's W&C Division sent an SSURO concerning Technical Grade PCNB to AMVAC. *Id*. at 68–74. The SSURO instructs AMVAC to "cease the distribution, sale, or use of Technical Grade PCNB" and all related products, and demands that the company "submit a written proposal for proper disposition of all violative pesticide products." *Id*. at 73. According to the SSURO, the presence of Impurity X in tested samples of AMVAC's Technical Grade PCNB products alerted EPA to the possibility that the version of the pesticide sold publicly by AMVAC differs chemically from the formula registered with the Agency, in violation of the FIFRA. *Id*. at 72.

Shortly after EPA issued the SSURO, AMVAC brought suit in this Court seeking a temporary restraining order, preliminary injunction, and permanent injunction barring the Agency from blocking AMVAC's manufacture and distribution of Technical Grade PCNB.[4] Motion for Preliminary Injunction and Temporary Restraining Order, Aug. 27, 2010 [2]. At a hearing less than a week later, the Court denied AMVAC's request for a TRO, Minute Entry, Sep. 2, 2010, and the parties subsequently agreed to merge the preliminary injunction and merits portions of this dispute. Status Report, Sep. 7, 2010 [11]. Following an agreed-upon schedule,

---

[4] In addition to EPA, Lisa Jackson is also named as a defendant in her official capacity as the Administrator of the Agency.

3

AMVAC moved for summary judgment, Motion for Summary Judgment, Oct. 15, 2010 [17] ("P's Mtn."), arguing that EPA's decision to issue the SSURO was inconsistent with the FIFRA, contrary to various requirements set forth in the Administrative Procedure Act ("APA"), and in violation of AMVAC's Fifth Amendment due process rights. *Id*. EPA subsequently cross-moved for judgment, Cross-Motion for Summary Judgment, Nov. 10, 2010 [23],[5] and the competing motions were fully briefed by the end of 2010.[6] For the reasons set forth below, the Court finds that EPA's issuance of the SSURO is contrary to law in violation of the APA, and therefore vacates the SSURO and remands this matter to the Agency.

**III. DISCUSSION**

A basic prerequisite to any act by a federal agency is that the agency possesses actual legal authority to undertake such action. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000). As a general matter, this authority often comes via a federal statute that delegates certain legislative and executive functions to the agency. But the requirement that the actor possess legal authority also trickles down to particular agency officials: "When a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004). A necessary corollary to this principle is that the particular official acting on behalf of the agency must have been delegated the authority to act; otherwise such agency action is invalid. *Ctr. for Auto Safety & Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 810 (D.C. Cir. 2005); *Flav-O-Rich, Inc. v. NLRB*, 531 F.2d 358, 363 (6th Cir. 1976);

---

[5] In addition to the merits dispute, EPA also moves to strike certain documents submitted by AMVAC in support of its motion for summary judgment. Motion to Strike, Nov. 10, 2010 [24]. In response, AMVAC moves the Court to consider extra-record evidence or, in the alternative, to supplement the administrative record. Motion to Consider Extra-Record Evidence, Nov. 29, 2010 [26]. Because the resolution reached by the Court today does not turn on any of the documents disputed by the parties, the Court will deny both motions as moot.

[6] This case was transferred by consent from Judge Roberts to Chief Judge Lamberth in May of this year. Reassignment of a Civil Case, May 5, 2011 [43].

*Pa. Mun. Auths. Ass'n v. Horinko*, 292 F. Supp. 2d 95, 104 (D.D.C. 2003); *see also Hazardous Waste Treatment Council v. Reilly*, 938 F.3d 1390, 1394 (D.C. Cir. 1991) (holding that agency action is final—and thus has legal effect—only if taken by officials possessing properly delegated authority). Thus, a court may uphold agency action only where the record establishes that the official who took such action was authorized to do so. *See, e.g.*, *East Hartford v. Harris*, 648 F.2d 4, 6 (D.C. Cir. 1980); *Globe, Inc. v. Fed. Home Loan Bank Bd.*, 471 F. Supp. 1103, 1104–06 (D.D.C. 1979); *Marimont v. Califano*, 464 F. Supp. 1220, 1223 n.5 (D.D.C. 1979). And these principles hold true for any federal statute, including the FIFRA.[7] *See Pac. Constr. Co. v. Branch*, 428 F.Supp.2d 727, 728 (D. Guam 1976) (denying local entity authority to enforce terms of FIFRA absent proper delegation by EPA Administrator under 7 U.S.C. § 136t).

AMVAC argues that the official who signed the SSURO—in this instance, the Director of the W&C Division—did not possess properly delegated authority, rendering the agency's action invalid. P's Mtn. 29 n.20. To support this contention, AMVAC submits an internal EPA memorandum in which the Assistant Administrator for Enforcement and Compliance Assurance delegates authority under the FIFRA—including the power to issue SSUROs—to the Director of the Toxics and Pesticides Enforcement Division ("T&P Division"). P's App. 132. Perhaps owing to the relegation of this argument to a brief footnote in a 44-page brief, EPA did not respond to AMVAC's position concerning Director Kelley's authority to issue the SSURO at issue—an omission that naturally led the company to expand the argument on reply, and to insist that EPA waived any objection to vacating the SSURO. Reply in Support of Motion for Summary Judgment 44–45, Nov. 29, 2010 [27]. EPA—conceding that it may have "misjudged" the importance of this issue, Reply in Support of Cross-Motion for Summary Judgment 12–13,

---

[7] The FIFRA provides: "All authority vested in the Administrator by virtue of the provisions of this subchapter may with like force and effect be executed by such employees of the [EPA] as the Administrator may designate for the purpose." 7 U.S.C. § 136t(a).

5

Dec. 17, 2010 [31] ("Cross-Mtn. Reply")—finally addresses the matter of delegation in its own reply brief, submitting three documents which, according to the Agency, permit the Court to trace the power to issue SSUROs from the EPA Administrator to the Director of the W&C Division. *Id*. at 13. In light of this new evidence, AMVAC submits—without objection from the Agency—a surreply on the delegation question. Surreply in Support of Motion for Summary Judgment 2–4, Feb. 23, 2011 [37]. In its surreply, AMVAC makes three arguments: first, EPA waived any opportunity to respond to the delegation argument, *id*. at 2–4; second, two of the documents submitted by the Agency are not official agency materials and thus not subject to judicial notice, *id*. at 5–6; and third, the three documents submitted do not, as a factual matter, establish that the Director of the W&C Division properly possesses authority under the FIFRA to issue the SSURO giving rise to this suit. *Id*.

The first two of these arguments may be disposed of easily. While it is true that an argument not raised by a party in the next available briefing is generally waived, it is equally true that the animating purpose of this principle is the inability of the opposing party to respond to such arguments. *See EDF, Inc. v. Costle*, 657 F.2d 275, 284 n.32 (D.C. Cir. 1981) (expressing concern that failure to strike new arguments would leave defendants without "a full and fair opportunity to adequately respond to [the] later arguments"). But in this instance EPA consented to the surreply, and thus AMVAC cannot be heard to complain that it did not have a genuine chance to address the record of delegation set forth by EPA on reply. *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 37 (D.D.C. 2010) (noting that filing of surreply "effectively negated the policy reasons for not allowing consideration of the new argument"). And as for AMVAC's second argument, while the Court may not be capable of taking judicial notice of some documents submitted by EPA, the relevant standard on summary judgment is not whether a

particular document is subject to judicial notice, but rather whether it is capable of being converted into admissible evidence. Fed. R. Civ. P. 56. In this instance, EPA submits internal documents that can presumably be authenticated if necessary and therefore constitute admissible evidence of any delegation of authority within the Agency. *Wolf v. CIA*, 473 F.3d 370, 375 n.5 (2007). Having disposed of AMVAC's two procedural objections, the Court now turns to the merits of this dispute.

The question at the heart of this debate—whether the evidence submitted by EPA establishes that the Director of the W&C Division possesses the authority necessary under the FIFRA to issue the SSURO, P's Mtn. at 29 n.20—is no small matter. As one district court observed, "once a regulation has been issued delegating power from one officer to a subordinate, the former may not thereafter invoke the delegated power himself, at least not as long as the regulation remains in effect." *Black v. Snow*, 272 F. Supp. 2d 21, 26 (D.D.C. 2003); *see also C&W Fish Co. v. Fox*, 931 F.2d 1556, 1560 (D.C. Cir. 1991) (rejecting agency's arguments that authority is inherently retained in official that delegates such authority to subordinate). This principle follows naturally from the well-established rule that "regulations validly prescribed by a government administrator are binding *upon him* as well as the citizen." *Service v. Dulles*, 354 U.S. 363, 372 (1957) (describing Supreme Court's earlier holding in *Accardi v. Shaughnessy*, 347 U.S. 260 (1954); emphasis added); *see also Black*, 272 F. Supp. 2d at 26 n.5 ("This doctrine both derives from and embodies the general principle that agencies are obligated to follow their own regulations.") (citing *Parson v. Dep't of Air Force*, 707 F.2d 1406, 1413 n.13 (D.C. Cir. 1983)). Thus where an agency official delegates authority to a subordinate, the official binds himself by such delegation and may not exercise such powers absent express retention of them. *Cf. C&W Fish Co.*, 931 F.2d at 1559–60 (relying on express reservation of authority to permit

7

intervening action by higher-ranking agency official). As a result, the fact that Congress generally gave EPA the authority to monitor and enforce compliance with the FIFRA does not absolve the Agency of its obligation to ensure that the official responsible for issuance of an SSURO properly possesses the statutory right to take such action. Absent evidence of such authority, issuance of the SSURO is not "in accordance with law" under the APA, 5 U.S.C. § 706(2)(A), and is therefore invalid.

EPA submits three documents to support its contention that the Director of the W&C Division possesses authority to issue SSUROs under the FIFRA. The first document, dated May 11, 1994 and included in EPA's Delegations Manual, authorizes "Regional Administrators and [the] Assistant Administrator for Enforcement and Compliance Assurance" to "issue stop sale, use, or removal orders as provided in the [FIFRA]." Ex. A to Cross-Mtn. Reply, Dec. 17, 2010 [31-1]. The second document, which AMVAC also submitted, is an EPA memorandum dated August 2, 1994 and titled "Redelegation of Stop Sale, Use or Removal Order Authority." Ex. B to Cross-Mtn. Reply, Dec. 17, 2010 [31-2]. According to this memorandum, the Assistant Administrator for Enforcement and Compliance Assurance redelegated the power to issue SSUROs under the FIFRA to the Director of the T&P Division. *Id*. EPA's final submission is not a single document, but rather a collection of internal memoranda and forms detailing a merger of several Divisions within the Agency. *See generally* Ex. C to Cross-Mtn. Reply, Dec. 17, 2010 [31-3] ("Merger Docs"). The Functional Statement included in these records states that the realignment created the W&C Division, which is made up of three Branches—the Waste Enforcement Branch, the Pesticides and Tanks Branch (formerly the T&P Division), and the Chemical Risk and Reporting Branch—each of which was previously an independent Division. *Id*. at 11–13. According to EPA, the responsibilities of the Director of the T&P Division,

8

including authority under the FIFRA, were transferred to the Director of the new W&C Division—who signed the SSURO—as a result of the realignment. Cross-Mtn. Reply at 13.

Having reviewed these records, the Court finds nothing in the documents submitted by EPA to establish any transfer of FIFRA-related authority to the Director of the W&C Division. Though some overlap between the former Divisions existed before the merger, the documents make clear that primary authority for enforcement of the FIFRA rested with the T&P Division. Merger Docs at 4 (noting that T&P Division "negotiat[ed] the settlement of a highly political FIFRA case"). And the merger itself was apparently not intended to consolidate the functions of each separate division into a single entity; instead, the plan was to "combin[e] *some* functions . . . and potential[ly] steamlin[e] certain functions." *Id*. at 2 (emphasis added); *see also id*. at 5 (same).[8] This intention is confirmed by the structural result of the merger—specifically, the realignment did not abolish the three separate Divisions and create a new one, but instead merely reorganized the department so that three formerly-independent Divisions are now three separate Branches or Subdivisions within the single W&C Division. *Id*. at 13. In light of this restructuring, the Court finds no evidence that the Director of the Pesticides and Tanks Branch—who possessed properly delegated authority to enforce the FIFRA as Director of the T&P Division—does not retain such authority post-merger. Indeed, the description of the three new Branches specifies that the Pesticides and Tanks Branch will "focus[] on all FIFRA . . . civil enforcement issues, including any enforcement response and civil penalty policies." *Id*. at 11. And last, but certainly not least, contrary to EPA's unsupported assertions, the plain language of the Reorganization Proposal unequivocally states that the merger *will not affect* any "Delegations of Authority, Orders or Manuals." *Id*. at 6.

---

[8] The documents specify neither which functions were combined as part of the single W&C Division, nor which functions remain with each individual Branch.

These deficiencies in the delegation record submitted by EPA are fatal. Once authority has been delegated to a certain agency official to take a particular action under a statute, *only* that official may take such action. *Supra*. And the fact that the person who authorized the SSURO in this case is the superior of the official who properly possesses authority to act under the FIFRA is immaterial. In *Service v. Dulles*, for example, the Supreme Court rejected the Secretary of State's attempt to overturn the judgment reached by the Deputy Under Secretary concerning a foreign service officer, as authority to adjudicate such cases was delegated to the Deputy Under Secretary and—by the plain terms of the delegation—"the Secretary bound himself not to act at all in cases such as this." 354 U.S. at 386–87. In this instance, the Court has no doubt that a reorganization of departments within EPA occurred; yet the Court finds no evidence that, as a result of that reorganization, delegated powers changed hands. Simply put, as long as the August 1994 delegation to the Director of the T&P Division remains valid, the Assistant Administrator for Enforcement and Compliance Assurance responsible for that delegation has "'denied himself the authority to exercise the discretion delegated to the [Toxics and Pesticides Division] even though the original authority was his.'" *Black*, 272 F. Supp. 2d at 26 (quoting *Nixon v. United States*, 418 U.S. 613, 695–96 (1974)). The Court therefore concludes that the SSURO was illegally issued, and will vacate the Order and remand this dispute to EPA for any further proceedings that the Agency deems necessary.

## IV. CONCLUSION

Having reviewed the parties' extensive briefs concerning the validity of the SSURO at issue in this case, the Court is loathe to dismiss this action on what may appear to be a minor procedural issue, particularly where—as here—several significant and substantive legal disputes remain. In doing so, however, the Court is reminded that federal agencies, though absent from

the Constitution, possess tremendous executive and legislative authority in our system of government, and it is therefore incumbent upon courts to ensure that such agencies follow the law, as well as their own rules and regulations. Though the FIFRA grants EPA the power to issue the SSURO in this case,[9] the Agency—having decided that this authority should rest with the Director of the T&P Division—must adhere to its earlier determination. And to the extent EPA desires that this power rest instead with the Director of the W&C Division, "the agency is free to change its regulations with the proper procedures." *GTE Int'l Inc. v. Hunter*, 649 F. Supp. 139, 147 (D.P.R. 1986). But in this instance, where—at least according to AMVAC—the Agency's decision to issue the SSURO has permanently erased more than $20 million in annual business, the Court will not stand idly by and permit significant action undertaken by an official who is not legally authorized to take it.

    A separate Order and Judgment consistent with these findings shall issue this date.

    Signed by Royce C. Lamberth, Chief Judge, on August 17, 2011.

---

[9] This statement assumes, of course, that the issuance of the SSURO is not otherwise infirm for the numerous reasons briefed by the parties but not reached by the Court in today's opinion.